Douglas K. BROCAIL, Appellant,

v.

Kyle ANDERSON, M.D., Henry Ford Health System, William Clay Ford Center for Athletic Medicine a/k/a, d/b/a and f/k/a Center for Athletic Medicine, Appellees.

No. 14–03–00239–CV.

Court of Appeals of Texas, Houston (14th Dist.).

March 11, 2004.

Rehearing Overruled May 6, 2004.

court's decision to adjudicate is to dismiss the appeal. *Phynes,* 828 S.W.2d at 2.

Thomas W. Pirtle, Levon G Hovnatani-an, Bruce E. Ramage, for appellant.

Oscar Luis Delarosa, Jeffrey Stewart Davis, David M. Gunn, Wesley Nagorny, Houston, for appellees.

Panel consists of Justices YATES, HUDSON, and FOWLER.

## OPINION

WANDA McKEE FOWLER, Justice.

In this appeal we must consider if a Michigan doctor, by agreeing to prescribe post-operative physical therapy through a Texas health care provider, had sufficient contacts with Texas to be subject to personal jurisdiction in the courts of this State. Douglas K. Brocail, formerly a pitcher for the Detroit Tigers, sued appellees Kyle Anderson, M.D., Henry Ford Health System, and the Center for Athletic Medicine,[1] all medical care providers for the Detroit Tigers, alleging that he sustained physical injury resulting from their medical negligence, gross negligence, and fraud in failing to discover or treat a torn

---

1. Other defendants also were sued but they are not part of this appeal.

ligament in his elbow and in failing to inform him of the full extent of his injury. The trial court granted appellees' special appearance and dismissed the claims against them. On appeal, Brocail argues that appellees' contacts with Texas were sufficient to confer personal jurisdiction over them because Anderson, a doctor employed by the Henry Ford Health System and the Center for Athletic Medicine, prescribed, approved, and monitored his post-surgery physical therapy in Texas for approximately three months. Finding that the physical therapy Anderson prescribed was follow-up physical therapy for elbow surgery—and that the follow-up care was done in Texas at Brocail's request and without any monetary benefit to Anderson—we affirm.

### FACTUAL BACKGROUND

Brocail was a professional baseball pitcher for the Detroit Tigers, a major league baseball team. The Tigers used the Henry Ford Health System (HFHS), a Michigan-based health care provider and regional medical center, to provide medical care for their players. In 2000, when Brocail injured his pitching elbow during baseball season, the Tigers referred him to Anderson, an employee of HFHS and a team doctor for the Tigers. Anderson practiced orthopedic surgery at various HFHS locations in Michigan.

Anderson recommended arthroscopic surgery for the elbow. Before the surgery, Anderson discussed with Brocail his treatment plan, outlining both the surgical procedure and the contemplated rehabilitation of the elbow. On September 22, 2000, Anderson performed the surgery in Michigan, and after the surgery, he prescribed

physical therapy for Brocail. However, baseball season was over for the Tigers, and Brocail decided to return to his home in Texas. At Brocail's request, Anderson agreed to prescribe physical therapy through a provider in Texas.

On October 4, 2000, Anderson faxed a prescription for physical therapy for Brocail to HealthSouth, a health care provider in Sugar Land, Texas.[2] Because physical therapy requires a doctor's approval, HealthSouth faxed a proposed "care plan" from Texas to Anderson for approval. Anderson reviewed the care plan and faxed his approval of the plan to Texas. Thereafter, Brocail underwent physical therapy at HealthSouth with a therapist named Wayne Brewer. Brewer prepared progress reports and faxed them from HealthSouth in Texas to Anderson in Michigan. On October 23, 2001, Anderson wrote a second prescription for additional physical therapy, including instructions to begin a "toss program" at eight to ten weeks after the surgery, and faxed it to HealthSouth. Additionally, on October 30, 2000, he faxed to HealthSouth a prescription for the application of a dynamic elbow splint. Approximately one month later, on November 28, 2000, Brewer faxed a proposed treatment plan for Brocail that included initiating "light tossing" in mid-December. Anderson reviewed the plan, approved it, and faxed it back the next day. In his affidavit, Brocail stated that he and Anderson discussed Brocail's physical therapy by telephone, and Anderson also discussed Brocail's treatment with the physical therapy staff in Texas, but Anderson testified he did not recall any such conversations.

---

**2.** Anderson signed the physical therapy prescription as "Referring Physician." Brocail also identified Anderson as the referring physician on HealthSouth's patient medical histo-

ry form. However, the record is unclear whether Anderson specifically referred Brocail to HealthSouth.

The therapy continued until early January 2001, when Brocail was discharged from treatment. On January 25, 2001, the Tigers sent a letter to HealthSouth to explain that they had traded Brocail to the Houston Astros. The letter directed that any medical bills after December 20, 2000, should be directed to the Astros rather than the Tigers.

On September 20, 2002, Brocail brought this lawsuit in Harris County, Texas, against appellees and other defendants, including the Detroit Tigers. He alleged medical negligence, gross negligence, and fraud. In response, Anderson and HFHS filed special appearances.[3] In support of his special appearance, Anderson submitted an affidavit in which he testified to the following: (1) he is licensed to practice medicine in Michigan, but not Texas; (2) he practices medicine exclusively in Michigan; (3) he has never practiced medicine in Texas; (4) he has never owned property or had bank accounts in Texas; (5) he has not advertised or attempted to solicit business in Texas; and (6) he is domiciled in Michigan. HFHS's corporate witness submitted an affidavit in support of HFHS's special appearance, making similar claims regarding its lack of contacts with Texas.

In preparing a response to the special appearance, Brocail conducted discovery on the jurisdictional issue, sending written discovery and deposing Anderson and HFHS's corporate witness. After a hearing, the trial court sustained the special appearance and dismissed Brocail's claims against appellees. Brocail requested findings of fact and conclusions of law, but the trial court refused to make them. This appeal followed.

## Analysis

### I. Burden of Proof

The plaintiff has the initial burden of pleading sufficient allegations to bring the nonresident defendant within the provisions of the Texas long-arm statute. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 793 (Tex.2002); *Hotel Partners v. KPMG Peat Marwick*, 847 S.W.2d 630, 633 (Tex.App.-Dallas 1993, writ denied). A defendant challenging a Texas court's personal jurisdiction over it must negate all jurisdictional bases. *Marchand*, 83 S.W.3d at 793; *Nat'l Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 772 (Tex.1995).

### II. Standards of Review

Whether a court has personal jurisdiction over a defendant is a question of law. *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 805–06 (Tex. 2002); *Marchand*, 83 S.W.3d at 794. But in resolving this question of law, a trial court must frequently resolve questions of fact. *Coleman*, 83 S.W.3d at 806; *Marchand*, 83 S.W.3d at 794. On appeal, the trial court's determination to grant or deny a special appearance is subject to de novo review, but we may be called upon to review the trial court's resolution of a factual dispute. *Coleman*, 83 S.W.3d at 806. When the trial court does not issue findings of fact, we presume that the trial court resolved all factual disputes in favor of its judgment. *Id.* However, when the appellate record includes the reporter's and clerk's records, these implied findings are not conclusive and may be challenged for legal and factual sufficiency. *Marchand*, 83 S.W.3d at 795.

**3.** A representative of HFHS testified that the defendant/appellee identified as "William Clay Ford Center for Athletic Medicine" is not an independent legal entity, but is simply a d/b/a of HFHS.

## III. State and Federal Jurisdictional Requirements

■ Texas courts may exercise jurisdiction over a nonresident if two conditions are satisfied: (1) the Texas long-arm statute authorizes the exercise of personal jurisdiction; and (2) the exercise of jurisdiction is consistent with federal and state constitutional guarantees of due process. *See Schlobohm v. Schapiro,* 784 S.W.2d 355, 356 (Tex.1990). The Texas long-arm statute authorizes Texas courts to exercise jurisdiction over a nonresident defendant who "does business" in the state, including by the commission of a tort, in whole or in part. TEX. CIV. PRAC. & REM.CODE § 17.042. The Texas Supreme Court has interpreted the broad language of the Texas long arm statute to extend Texas courts' personal jurisdiction "as far as the federal constitutional requirements of due process will permit." *Marchand,* 83 S.W.3d at 795 (citing *U–Anchor Adver., Inc. v. Burt,* 553 S.W.2d 760, 762 (Tex.1977) (noting that "the reach of [the Texas long-arm statute] is limited only by the United States Constitution")). As a practical matter, therefore, we need consider only whether it is consistent with federal constitutional requirements of due process for Texas courts to assert personal jurisdiction over Greene. *See Guardian Royal Exch. Assurance Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991).

■ Federal constitutional requirements of due process limit a state's power to assert personal jurisdiction over a nonresident defendant. *Id.* Personal jurisdiction over a nonresident defendant is constitutional when two conditions are met: (1) the defendant has established minimum contacts with the forum state; and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Marchand,* 83 S.W.3d at 795 (citing *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

■ Under the minimum contacts analysis, we must determine whether the nonresident defendant has purposefully availed itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of the state's laws. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474–75, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Guardian Royal,* 815 S.W.2d at 226. A nonresident defendant that purposefully avails itself of the privileges and benefits of conducting business in the forum state has sufficient contacts with the forum to confer personal jurisdiction on the court. *See Burger King,* 471 U.S. at 474–76, 105 S.Ct. 2174; *Marchand,* 83 S.W.3d at 795. The purposeful availment requirement is a threshold that protects nonresidents; it ensures that the nonresident's connections derive from its own purposeful conduct, and not from random, fortuitous, or attenuated contacts with the forum, or worse, from another's acts. *Marchand,* 83 S.W.3d at 795; *Guardian Royal,* 815 S.W.2d at 226–27. The nonresident must take some action or engage in some conduct creating a "substantial connection" with the forum state. *Guardian Royal,* 815 S.W.2d at 226.

■ Foreseeability of being haled into the forum's courts is an important consideration in deciding whether the nonresident defendant has purposefully established minimum contacts with the forum state. *Guardian Royal,* 815 S.W.2d at 227. It is not an independent component of the minimum contacts analysis, but is implicit in the test. If a "substantial connection" exists between the nonresident and Texas arising from the nonresident's purposeful conduct directed towards Texas, he should be able to foresee being subject to Texas courts. *Id.* Individuals

must have fair warning that a particular activity may subject them to the jurisdiction of a foreign sovereign. *Burger King,* 471 U.S. at 472, 105 S.Ct. 2174; *Guardian Royal,* 815 S.W.2d at 226; *see also World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) (holding that the foreseeability critical to due process "is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there").

 Jurisdiction must also comport with traditional notions of fair play and substantial justice. *Burger King,* 471 U.S. at 476, 105 S.Ct. 2174; *Guardian Royal,* 815 S.W.2d at 228. The following factors, when appropriate, should be considered: (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. *World–Wide Volkswagen,* 444 U.S. at 292, 100 S.Ct. 559; *Guardian Royal,* 815 S.W.2d at 231.

 Texas courts may exercise two types of jurisdiction based on a nonresident's contacts with the state. If the controversy arises out of or relates to the defendant's contacts with Texas, the court may invoke specific jurisdiction over the nonresident defendant. *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Marchand,* 83 S.W.3d at 796. If the cause of action does not arise out of the contacts, Texas courts may exercise personal jurisdiction over a nonresident defendant who maintains continuous and systematic contacts with the state. *Heli-*

*copteros,* 466 U.S. at 414, 104 S.Ct. 1868; *Marchand,* 83 S.W.3d at 796. Here, only specific jurisdiction is alleged.

 Specific jurisdiction is established if the defendant's alleged liability arises from or is related to an activity conducted within the forum. *Marchand,* 83 S.W.3d at 796. The defendant's activities must have been purposefully directed toward the forum state. *See Guardian Royal,* 815 S.W.2d at 228. When specific jurisdiction is asserted, the minimum contacts analysis focuses on the relationship among the defendant, the forum, and the litigation. *See id.*

## IV. Did Appellees Demonstrate They Lack Minimum Contacts to Support the Assertion of Personal Jurisdiction in Texas?

Brocail alleges Anderson purposefully directed his activities to Texas. He claims Anderson did this by (1) referring Brocail to a physical therapy provider in Texas, (2) faxing prescriptions for initial and continued treatment to Texas, (3) receiving and reviewing information on Brocail's progress from Texas, and (4) making and forwarding additional diagnoses and prescriptions for treatment to Texas. Brocail emphasizes that HealthSouth could not administer physical therapy to Brocail without a doctor's approval. Additionally, Brocail contends that, while he was undergoing treatment in Texas, appellees never fully disclosed to him the extent or nature of his injuries, and that he relied on this to his detriment in Texas. He claims Anderson could have foreseen that Brocail would experience the brunt of any physical and economic injury arising from his contacts in Texas. And, because Anderson's contacts were made in the course and scope of his employment, Bro-

cail argues that they are also attributed to HFHS.[4]

In response, Anderson argues that he, as a team doctor for the Detroit Tigers, performed surgery on Brocail in Michigan and prescribed rehabilitative treatment for him in Michigan. The post-surgical rehabilitation that took place in Texas was only in the nature of routine follow-up care, which Brocail chose to undergo in Texas. Because any contacts with Texas were merely fortuitous, Anderson contends he cannot be subject to personal jurisdiction here.

### A. The "Out–of–State Doctor" Cases

In considering whether to subject an out-of-state doctor to personal jurisdiction within a state, courts have fashioned special rules that they apply in conjunction with the general jurisdiction analysis just reviewed. *See, e.g.,* Matthew Ryan Booker, Commentary, *Physicians, Malpractice, and State Lines: A Guide to Personal Jurisdiction in Medical Malpractice Lawsuits,* 20 J. Legal Med. 385, 393–403 (1999); Joelle Lee A. Nicol, Note, *Given an Opportunity to Redefine the Gray Area of "Minimum Contacts," the Court in Prince v. Urban Chose to Remain in the Dark,* 25 W. St. U.L.Rev. 313, 330–67 (1998); *Kennedy v. Freeman,* 919 F.2d 126 (10th Cir.1990). In support of his position, Anderson directs us to a line of "out-of-state doctor" cases represented by the seminal case of *Wright v. Yackley,* 459 F.2d 287 (9th Cir.1972). Yackley, a South Dakota doctor, prescribed medication for Wright, who was then a resident of South Dakota. Wright moved to Idaho and, at Wright's request, Yackley forwarded copies of the original prescriptions so that Wright's Idaho pharmacist would continue to refill them. *Id.* at 288. Wright later brought a malpractice action against Yackley for injury arising from the use of the medication. The *Wright* court rejected the notion of a "portable tort" that moves with the patient. *Id.* at 290. Instead, the court reasoned that a doctor's focus is not on a place, but on a person:

> In the case of personal services focus must be on the place where the services are rendered, since this is the place of the receiver's (here the patient's) need. The need is personal and the services rendered are in response to the dimensions of that personal need. They are directed to no place but to the needy person herself. It is in the very nature of such services that their consequences will be felt wherever the person may choose to go. However, the idea that tortious rendition of such services is a portable tort which can be deemed to have been committed wherever the consequences foreseeably were felt is wholly inconsistent with the public interest in having services of this sort generally available. Medical services in particular should not be proscribed by the doctor's concerns as to where the patient may carry the consequences of his treatment and in what distant lands he may be

---

**4.** Brocail also challenges the legal and factual sufficiency of any implied finding of fact that: (1) Anderson did not purposefully direct his activities to Texas; (2) Anderson was not an employee of HFHS acting within the course and scope of his employment when he treated Brocail in Texas; (3) Anderson or HFHS personnel did not talk by telephone to Brocail's therapist, Wayne Brewer or HealthSouth personnel in Texas; (4) HealthSouth did not send Anderson progress reports from Texas and that Anderson reviewed them; (5) Anderson did not send to Texas his approval of care plans, treatment regimens, and treatment plans he received from HealthSouth; (6) HealthSouth did not need Anderson's or another doctor's approval to administer plaintiff's treatment in Texas; (7) Anderson did not render treatment in Texas; (8) Anderson did not render any diagnosis in Texas; or (9) Anderson did not refer Brocail to HealthSouth in Texas.

called upon to defend it. The traveling public would be ill served were the treatment of local doctors confined to so much aspirin as would get the patient into the next state. The scope of medical treatment should be defined by the patient's needs, as diagnosed by the doctor, rather than by geography.

*Id.* at 289–90. The *Wright* court's reasoning—that a physician's services are personal and not directed at a specific location—has been followed by numerous courts, including several in Texas. *See, e.g., Townsend v. Univ. Hosp.,* 83 S.W.3d 913, 921 (Tex.App.-Texarkana 2002, pet. denied); *Vogel v. Bellows–Blakely,* 1999 WL 270330, *3 (Tex.App.-Dallas 1999, no pet) (not designated for publication); *Oden v. Marrs,* 880 S.W.2d 451, 457 (Tex.App.-Texarkana 1994, no writ); *Clark v. Noyes,* 871 S.W.2d 508, 514 (Tex.App.-Dallas 1994, no writ).

*Wright* has also factored significantly in case law in which a nonresident doctor renders primary medical treatment to a patient in the doctor's home state, but later provides follow-up care to the patient out-of-state. *See, e.g., Sanders v. Buch,* 938 F.Supp. 532 (W.D.Ark.1996); *Vance v. Molina,* 28 P.3d 570 (Okla.2001); *Prince v. Urban,* 49 Cal.App.4th 1056, 57 Cal. Rptr.2d 181 (1996); *Hume v. Durwood Med. Clinic, Inc.,* 282 S.C. 236, 318 S.E.2d 119 (App.1984). We think these cases, involving situations similar to this case, provide appropriate guidance for our resolution of the jurisdictional question here.

In *Sanders v. Buch,* Buch operated on Sanders' ankle following a work-related injury in Dallas, Texas, and continued to treat Sanders for his injuries in his office and in various hospitals in Dallas for about a year. 938 F.Supp. at 534. Sanders then moved to Arkansas, where his treatment continued with home health services provided by an Arkansas medical center. The medical center identified Buch as Sander's doctor, and called him for physician's orders, which Buch later confirmed and signed. For over two weeks, Sanders was provided treatment pursuant to Buch's orders, the orders were discussed over the phone by Buch and his employees, and Buch signed various forms confirming his orders. *Id.* at 534. Sanders later brought a malpractice action premised on a series of acts and omissions by Buch and others that occurred in Arkansas. In holding that Buch was not subject to personal jurisdiction in Arkansas, the *Sanders* court closely examined *Wright* and concluded that Buch did not purposefully initiate activity within the forum state, and did nothing to invoke the benefits and protections of Arkansas. *Id.* at 537–38. As the court explained: "The doctor-patient relationship was established in Texas, Sanders resided in Texas at the time the relationship was established, all visits and hospitalizations occurred in Texas, the request for home health care originated in Texas, and the 'prescription' for home health care was written in Texas." *Id.* at 538. The court acknowledged that the treatment took place in the forum state, but the court held that this was not enough, and that the doctor had not done "anything more than confirm his orders regarding the care, respond to inquiries regarding the course of treatment, and receive reports regarding the same from Arkansas." *Id.*

In the more recent case of *Vance v. Molina,* Molina performed in Texas two gastric segmentation surgeries on Vance, an Oklahoma resident. After each surgery, Molina communicated by telephone several times with Vance's Oklahoma physicians regarding her condition and treatment. The Oklahoma Supreme Court held that personal jurisdiction could not be exercised over Molina. 28 P.3d at 572. The court examined *Wright* and other similar

cases and concluded that "[m]ost of those cases have held that a doctor who provides primary treatment to a nonresident in his home state and follow up advice to the patient and her local doctors in her home state can't be sued in the patient's home state." *Id.* at 573. The court found that the Texas doctor's discussions were "ancillary" and "incidental" to the surgeries the doctor performed in Texas, concluding that specialty care involves follow-up care, and that a doctor has an ethical obligation to render follow-up care. *Id.* at 574.

In *Prince v. Urban,* Prince, a California resident who suffered from migraines, was referred to Urban, an Illinois headache specialist, for treatment. 57 Cal.Rptr.2d at 182. After receiving treatment in Illinois, Prince returned to California with prescriptions for various medications. While there, she had numerous telephone conferences with Urban, for which she was charged, and when her medication ran out, Urban or an associate had additional medication mailed to her in California, and sometimes called prescriptions directly to California pharmacies for her. The medications caused Prince to become confused and dysfunctional, and she required hospitalization at a California detoxification facility. Prince then sued for malpractice. *Id.*

In affirming the lower court's finding that it lacked personal jurisdiction, the *Prince* court expressly based its conclusion on the *Wright* court's reasoning that a physician's services are personal and are directed to a specific patient, not a location. *Id.* The court held that "[f]ollow up consultation ancillary to the examination and treatment made by the out-of-state patient, or arrangements for a patient to continue with medication prescribed by that doctor do not reach the minimum contacts necessary for the satisfaction of due process." *Id.* at 184. In so holding,

the court noted that the *Wright* court "based its decision on the nature of medical services rather than just declaring that certain services fell on one side of the line . . . or the other." *Id.* at 185.

The outcome in *Hume v. Durwood Medical Clinic* differs in its analysis from that in *Sanders, Vance,* and *Prince,* but reaches the same result. The *Hume* court found that the follow-up care provided by the out-of-state doctor was sufficient to invoke personal jurisdiction, but held that its exercise would offend fair play and substantial justice. *See* 318 S.E.2d at 122. Hume, a resident of South Carolina, was referred by his doctor to two North Carolina specialists, who treated him over a period of years. The specialists knew Hume was from South Carolina, they collaborated with Hume's South Carolina doctor regarding Hume's treatment by advising the doctor and furnishing him with medical records, and one of the specialists wrote a letter to Hume in South Carolina furnishing medial advice. After Hume had a heart attack and died, his administratrix brought a malpractice action in South Carolina against the doctors and their clinic. *Id.*

The court, after reviewing the case law, determined that the invocation of personal jurisdiction over a nonresident doctor would be appropriate in those cases in which the doctor "engaged in a course of treatment by mail or his conduct involved a breach of a duty to provide follow-up care in the forum state." *Id.* at 122. The *Hume* court held that the administratrix had shown, "by the barest facts," that the specialists had engaged in a course of treatment of Hume in North Carolina, and to satisfy their obligation to provide follow-up care to Hume, they had "attempted by mail and telephone to provide *some* treatment to him in South Carolina." *Id.* Nevertheless, the *Hume* court held that exer-

cising jurisdiction over the specialists would offend due process in light of the "tenuous" relationship between the specialists and the forum, explaining that they "were merely fulfilling their professional responsibilities to provide medical services to a patient in need, and should not by so doing automatically subject themselves to the jurisdiction of the courts of this State." *Id.* at 123. The court also found that the exercise of jurisdiction would be unreasonable in light of the countervailing interests in providing a forum for South Carolina citizens to redress injuries and the chilling effect that the exercise of jurisdiction would have on the availability of medical services in South Carolina. *Id.* Finally, the court also noted that the plaintiff failed to demonstrate that being required to litigate in North Carolina would impose any burden on her. *Id.*

### B. This Case is Similar to These "Out–of–State Doctor" Cases

 With these cases as a backdrop, we now turn to our analysis of Anderson's contacts. Anderson was a team doctor for the Detroit Tigers. He practiced sports medicine and orthopedic surgery at various locations in Michigan. He did not travel with the team, and when he treated Detroit Tigers baseball players, he did so *in Michigan.* Anderson diagnosed Brocail's injury and performed surgery on him in Michigan. Following the surgery, Anderson prescribed physical therapy for Brocail and wrote the prescription for rehabilitation in Michigan. There was also some evidence that the therapy may have started informally in Michigan.

Anderson did not direct Brocail to go to Texas for the rehabilitation; Brocail unilaterally decided to return to his home in Texas. In fact, although Brocail disputed it, Anderson testified that he was not sure he knew where Brocail lived. Anderson also testified that he preferred that the post-surgical physical therapy take place in Michigan: "Ideally it would be done here where I can contact people, but we don't refuse treatment because somebody wants to go home." And, while it is undisputed that Anderson faxed the rehabilitation prescription to HealthSouth, it is unclear from the record how Brocail came to use HealthSouth's facility in the first place.[5] There was no evidence that Anderson told Brocail to obtain treatment from HealthSouth.

Once Brocail began his therapy in Houston, Anderson approved the care plans HealthSouth's therapist prepared, reviewed some progress reports, ordered light tossing and a dynamic elbow splint, and twice prescribed the continuation of the therapy originally prescribed in Michigan for a total of three months of therapy. Anderson did not bill Brocail for these services, and Brocail made no payments to Anderson for them.

These facts are practically indistinguishable from those in *Sanders.* There the court found that personal jurisdiction did not exist over the out-of-state doctor because his only contacts were confirming his orders for home health care with the provider, responding to inquiries regarding the course of treatment, and receiving reports regarding the treatment from the forum state. *See* 938 F.Supp. at 537–38. Brocail argues that additional contacts present here—prescribing initiation of "light tossing," and prescribing a dynamic

---

5. In his affidavit, Brocail states that Anderson knew he lived in Texas, and therefore Anderson "prescribed physical therapy for me at his direction to be conducted in Houston, Texas" and "[t]he physical therapy was conducted at a HealthSouth facility located in Sugar Land, Texas." However, Brocail does not specifically state that Anderson referred him to HealthSouth.

elbow splint—go beyond merely "confirming" orders. We agree that these activities make this a closer case than *Sanders,* but we do not think they are sufficient to cross the constitutional threshold separating no jurisdiction from jurisdiction.[6] We find these contacts more in the nature of continuing the follow-up treatment. Accordingly, we find this case more analogous to *Sanders, Vance,* and *Prince* than it is to the authorities Brocail relies upon.[7]

We also distinguish this case from *Hume,* in which the court found the specialists' contacts constituted a course of treatment in the specialists' home state and the follow-up care amounted to treatment by mail and telephone. *See* 318 S.E.2d at 122. There, however, the specialists treated Hume in North Carolina over a period of years, collaborated with Hume's doctor in South Carolina, and furnished medical advice by letter to Hume. *Id.* at 120–21. These contacts are more significant than those here—in both duration and quality. Anderson did not directly provide continuing primary care to Brocail once Brocail returned to Texas; he

merely authorized and affirmed the course of rehabilitative treatment he prescribed. If the facts of *Hume* constituted the "barest facts" creating only a "tenuous" relationship to the forum, *see id.* at 122–23, the contacts here—which are even less—cannot create even a tenuous relationship with Texas. They are, at their best, fortuitous and attenuated and—worse—arise from another's acts. *See Marchand,* 83 S.W.3d at 795.[8]

Brocail argues that jurisdiction over Anderson is proper because he has alleged the commission of torts in whole or in part in Texas—medical negligence, fraud, and fraudulent concealment based on the failure to fully disclose the true extent of his injuries. But Brocail is complaining about a physical injury based on a course of treatment. Any tort occurred in the exercise of medical judgment in prescribing a course of physical therapy in Michigan, not from the communication of that prescription to HealthSouth. *See Wright,* 459 F.2d at 288 ("[if the doctor] was guilty of malpractice, it was through acts of diagnosis

**6.** Additionally, Brocail argues that *Sanders* is distinguishable because Sanders moved to the forum state after receiving primary treatment from Buch, whereas here, Brocail lived in Texas at all relevant times and merely returned home. However, we do not find this fact to be extremely significant to our analysis, given the totality of the circumstances present here, especially since Brocail was in Detroit part of the year as a pitcher for the Detroit Tigers.

**7.** Brocail relies primarily on four cases he contends contain contacts similar to those alleged here: *Bullion v. Gillespie,* 895 F.2d 213 (5th Cir.1990); *Kennedy v. Freeman,* 919 F.2d 126 (10th Cir.1990); *Gonzales v. Chandel,* 13 F.Supp.2d 1197 (D.Kan.1998); and *McGee v. Riekhof,* 442 F.Supp. 1276 (D.Mont. 1978). However, we find the cases we have discussed factually closer to this case than those Brocail relies upon. Moreover, we disagree with the result in *McGee v. Riekhof.*

There, a Utah doctor performed surgery to repair the retina of the plaintiff, a Montana resident, in Utah. *See* 442 F.Supp. at 1277. At some point thereafter, the doctor advised the plaintiff's wife by telephone that the plaintiff could return to work. When he did so, however, serious complications resulted, and thereafter the plaintiff sued the Utah doctor in Michigan. The *McGee* court found personal jurisdiction on the basis of that single telephone call, holding that it constituted a "new diagnosis" rendered telephonically in Montana. *Id.* at 1278. We find the reasoning unpersuasive.

**8.** Brocail also argues that Texas has a legitimate interest in providing a convenient and effective forum for its residents, but this argument goes to the second prong of the due process analysis—whether the exercise of jurisdiction over the nonresident comports with traditional notions of fair play and substantial justice—which we do not reach.

and prescription performed in [his home state]"); *see also Kennedy v. Advantage Health Plan, Inc.,* 2001 WL 25755, at *4 n. 6 (Tex.App.-Houston [14th Dist.] 2001, no pet.) (not designated for publication) ("The wrongful act, if any, was appellees' decision, which was made in Louisiana, not the communication of that decision to Dr. Campbell in Texas.").

Brocail's attempt to establish jurisdiction is not improved by his claim that appellees never fully disclosed to him the nature and extent of his injuries while he was in Texas, and that he relied on this nondisclosure in Texas. "By its very nature, failure to disclose demonstrates that a party did not have contacts with the forum state." *Anderson v. Bechtle,* 2001 WL 930205, at *2 (Tex.App.-Houston [1st Dist.] Aug. 16, 2001, no pet.) (not designated for publication). Indeed, "it is difficult to see how a failure to act could meet the purposeful availment requirement needed to establish personal jurisdiction." *Id.; see also Vogel,* 1999 WL 270330 at *6 (holding that a failure to act does not constitute an affirmative act required for the assertion of specific jurisdiction).

### CONCLUSION

We acknowledge that this is a close case. However, applying the special rules formulated for doctor-patient litigation when a doctor having a local practice has contacts with a patient in another state, the state of the record supports no jurisdiction. The great bulk of the treatment falls squarely under the follow-up care cases. Two events arguably increase the chances of asserting jurisdiction: prescribing the elbow splint and the initiation of "light tossing." The question then becomes whether those two facts by themselves throw the balance toward asserting jurisdiction. We conclude that they do not. Thus, after carefully considering the merits of Bro-

cail's claims, we hold that Anderson's contacts with Texas, when viewed in their entirety, are not sufficient to constitute purposeful availment of the benefits and protections of practicing medicine in Texas.

The judgment of the trial court is affirmed.