# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00758-CV

**Cenoplex, Inc., Appellant**

**v.**

**Scott Fox, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
### NO. D-1-GN-12-002685, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Cenoplex, Inc. appeals from the trial court's grant of Scott Fox's special appearance and the dismissal of Cenoplex's suit against Fox. Cenoplex contends that the trial court erred by concluding that Texas had no specific jurisdiction over Fox and that exercising jurisdiction over him would violate traditional notions of fair play and substantial justice. Cenoplex also contends that the trial court erred by making its dismissal with prejudice. We will modify the district court's order as described below and affirm the order as modified.

## BACKGROUND

Cenoplex provides services to wireless telephone companies. It was established as a Nevada corporation with its primary place of business in Los Angeles, California. In 2009, it hired Fox in California as a consultant and, in July 2010, made him its chief strategy officer and

chairman of the board.[1]  Fox testified that the company had eleven employees.[2]  Many of Cenoplex's employees, including Fox, lived in Southern California with a few in other states.  Fox testified that the chief partnership officer lived in Nevada and that the chief technology officer, chief marketing officer, the vice president of sales, and some engineers all lived in California.  He said that the Cenoplex board members lived in California, Wisconsin, Florida, and Ontario and that the board of advisors members lived in Washington, California, New York, and other places.

In the summer of 2010, Cenoplex's chief executive officer and president, Greg Welch, moved to Austin, Texas, and the company moved its headquarters to Austin in April 2011.  Cenoplex hired Susan Georgen-Saad in Austin in March 2011 as a consultant and later named her its chief financial officer.  Cenoplex hired executive assistant Juddi Strader in Austin in July 2011.  Its bank accounts moved to Texas at some point in 2011-2012.  The company had weekly "all-hands" staff teleconferences and at least five board teleconferences that connected Fox in California with Welch, Georgen-Saad, and Strader in Texas and others in various locations.

Fox participated in these meetings as both strategy officer and board chairman.  Fox testified that as strategy officer he reported to CEO Welch, while as board chairman he oversaw Welch's performance.  He testified that Welch led the all-hands conference calls and that Welch and the board members often communicated directly with each other.  Fox said he communicated with Welch and Strader primarily electronically.  Fox testified that he would sometimes go weeks without communicating with Welch, but would sometimes exchange several emails in a day.  He nevertheless characterized their communication as "regular."

---

[1]  After hiring Fox, Cenoplex became a Delaware corporation.

[2]  Cenoplex chief financial officer Susan Georgen-Saad testified that there were fifteen employees—however, it is not clear whether they were discussing the same moment in time.

Strader swore in her declaration that she received at least 50 emails from Fox directing her activities in the nearly ten months they both worked for Cenoplex. Their emails covered topics including scheduling, meetings, updates on clients, company strategy, and travel. She said that Fox directed meetings and gave instructions regarding actions that the company should take in Texas and that employees in Texas should take on behalf of the company. She helped arrange Fox's travel to Texas in December 2011 to visit the then-new headquarters office and in April 2012 to discuss concerns raised by board member and investor Sheldon Burnett.

Burnett, who lived in Florida, stated in his declaration that he and other board members began to suspect in early 2012 that Welch and/or Georgen-Saad were misusing company funds and preparing fraudulent financial statements. He stated in his declaration that he attempted to call emergency board meetings but was blocked by Fox. He summoned Fox to Florida to discuss his concerns, but Fox failed to request or examine the financial records maintained in Austin.

Fox testified at the hearing on his special appearance that, although he went to Florida April 19, 2012, at Burnett's request, Burnett chose not to meet with him in person. Fox stopped overnight in Austin on his return to California on April 20-21, 2012. He met with the Austin employees and asked Welch about Burnett's concerns and whether there was anything that Welch should tell Fox. Welch denied any wrongdoing during their meeting, but on April 22, 2012, after Fox returned to California, Welch admitted that Cenoplex was paying for his condominium. Fox denied blocking board meetings as Burnett asserted. Fox testified that Burnett made his first request for a board meeting on the morning that Fox was flying home from Texas to California on April 21, 2012. Despite the general policy that board meetings be held with two weeks' notice and the response by some board members that they had conflicts, the board met telephonically on

3

Monday, April 23, 2012—the earlier of the two days that Burnett requested. Fox testified that he was thereafter excluded from company business, though he was not formally separated from the company until later that year. Welch and Georgen-Saad also were separated from the company. Cenoplex's counsel stated at the hearing that the company moved its headquarters back to California, but did not say when that moved occurred. Only Strader remained in Texas, although counsel stated that the company's records were still in Texas.

Cenoplex filed suit against Fox in Austin on August 30, 2012, alleging breach of fiduciary duty and negligence in his performance as CSO and chairman of the board. Cenoplex alleged that Fox intentionally delayed board meetings, obstructed the board's discovery of the misuse of company funds, failed to request or examine the records of the company, and used company resources for himself. It alleged that Texas courts have jurisdiction because Fox was paid from bank accounts in Texas and purposely availed himself of the privileges and benefits of conducting business in Texas by contracting with, working for, and directing the employees of a company that had its principal place of business in Austin. Cenoplex asserted that Fox committed torts in Texas that related directly to Fox's contacts with Cenoplex and his actions in Texas. In its amended petition following Fox's special appearance, Cenoplex described itself as "doing business in Texas," but no longer alleged its principal place of business as being in Texas.

After the hearing, the district court sustained Fox's special appearance. In its findings and conclusions, the court stated that it had neither general nor specific jurisdiction over Fox. It concluded that there was not a sufficient nexus between Fox's conduct, Texas, and the torts allegedly committed, that Fox did not purposefully avail himself individually of the privileges of conducting activities in Texas, that he could not individually have reasonably expected to be haled into

4

Texas courts, and that he did not have sufficient minimum contacts with Texas to warrant an exercise of in personam jurisdiction over him. The district court also concluded that the burden and expense of forcing the parties to litigate the dispute in another forum—e.g., California, where the court concluded that both parties and several witnesses reside—is minimal compared to the burden on Fox to litigate in Texas. The court further concluded that Texas has little or no interest in adjudicating a dispute between California residents that is governed by non-Texas law. The court finally concluded that exercising personal jurisdiction over Fox would violate traditional notions of fair play and justice as well as his constitutional right to due process.

## APPLICABLE LAW AND STANDARD OF REVIEW

Texas courts may exercise jurisdiction over a nonresident if the Texas long-arm statute authorizes the exercise of personal jurisdiction and the exercise of jurisdiction is consistent with federal and state constitutional guarantees of due process. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007). The Texas long-arm statute authorizes Texas courts to exercise jurisdiction over a nonresident defendant who "does business" in the state or

> (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state;
>
> (2) commits a tort in whole or in part in this state; or
>
> (3) recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state.

Tex. Civ. Prac. & Rem. Code § 17.042. The Texas Supreme Court has interpreted the broad language of the Texas long-arm statute to extend Texas courts' personal jurisdiction "as far as the federal constitutional requirements of due process will allow." *BMC Software Belgium, N.V.*

5

*v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). As a practical matter, therefore, we need consider only whether it is consistent with federal constitutional requirements of due process for Texas courts to assert personal jurisdiction over the nonresident defendant. *See Moki Mac*, 221 S.W.3d at 575.

The Texas Supreme Court adopted a three-part test for assessing whether to assert personal jurisdiction:

> (1) the nonresident defendant or foreign corporation must purposefully do some act or consummate some transaction in the forum state;
>
> (2) the cause of action must arise from, or be connected with, such act or transaction; and
>
> (3) the assumption of jurisdiction by the forum state must not offend traditional notions of fair play and substantial justice, consideration being given to the quality, nature, and extent of the activity in the forum state, the relative convenience of the parties, the benefits and protections of the laws of the forum state afforded the respective parties, and the basic equities of the situation.

*Guardian Royal Exchange Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 230 (Tex. 1991). For the third prong of the test, the following additional factors, when appropriate, should be considered:

> (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute (including the state's special regulatory interest in areas such as insurance); (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies.

*Id.* at 231. Only in rare circumstances will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has established minimum contacts. *Id.*

Whether a trial court has personal jurisdiction over a defendant is a question of law we review de novo. *Moki Mac*, 221 S.W.3d at 574. The plaintiff has the initial burden of pleading allegations sufficient to bring the nonresident defendant within the provisions of the Texas long-arm statute. *BMC*, 83 S.W.3d at 793; *Brocail v. Anderson*, 132 S.W.3d 552, 556 (Tex. App.—Houston [14th Dist] 2004, pet. denied). A defendant challenging a Texas court's personal jurisdiction over it must negate all jurisdictional bases alleged. *BMC*, 83 S.W.3d at 793. The defendant may negate jurisdiction on a legal basis by showing that, even if the plaintiff's allegations are true, they do not establish jurisdiction. *Kelly v. General Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010). Though we generally take pleadings as true when considering whether the plaintiff has properly invoked the jurisdiction of the court, the pleadings merely create a presumption that can be rebutted and overcome by evidence submitted on the issue. *Id.*; *see also Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 476 (Tex. 2012).

## DISCUSSION

Cenoplex contends that the trial court erred by determining that Texas lacked specific jurisdiction[3] and that exercising personal jurisdiction over Fox would be unreasonable. Cenoplex also argues that the trial court erred by dismissing this case with prejudice.

**Specific Jurisdiction**

Cenoplex contends that its pleading and evidence demonstrate that Fox committed tortious conduct at least in part in Texas by failing to properly supervise Welch and preventing

---

[3] On appeal, Cenoplex does not assert that the trial court should have found that Fox's interactions with Cenoplex conferred general jurisdiction on the trial courts of Texas.

the board from doing so. Cenoplex contends that he continuously and systematically communicated with Welch and Georgen-Saad while they were in Texas, directed meetings with and the actions of employees in Texas, failed to request or examine company records in Texas even when he visited Texas, failed to require Welch and Georgen-Saad to produce records, and conducted a superficial and negligent investigation in Texas of allegations of wrongdoing. Cenoplex alleges that Fox committed these acts and omissions while Cenoplex was headquartered, had officers, stored records, and had bank accounts in Austin.

The fact that Cenoplex seeks recovery for Fox's *failure* to act in Texas and elsewhere presents a great challenge to establishing jurisdiction, as illustrated by two cases: *Rushmore Inv. Advisors, Inc. v. Frey*, 231 S.W.3d 524 (Tex. App.—Dallas 2007, no pet.); *Brocail*, 132 S.W.3d 552.

In *Rushmore*, a Texas investment advisor company hired Pennsylvania resident Frey to work from her home. Frey came to Texas for a week of orientation and, while here, signed an employment agreement that did not contain a venue provision. 231 S.W.3d at 526. Rushmore fired Frey after twenty-two months, then sued her for misappropriation of trade secrets, breach of contract, and unfair competition. *Id.* at 526-27. Rushmore alleged that Frey worked for a Texas corporation, identified Rushmore and its home office as her employer on various official forms, physically visited Rushmore's office in Texas at least five times, represented to the public that she worked at Rushmore's Texas office through her business cards and telephone number/voice mailbox at Rushmore's office, received compensation drawn on a Texas bank account, solicited at least twenty-three Texas customers, participated in at least six sales meetings in Texas, and directed phone calls and emails at Texas residents on a daily basis. *Id.* at 529. Rushmore also noted that Frey signed an employment agreement providing that Texas law would govern disputes between

the parties. *Id*. at 527. Frey filed a special appearance stating that she had never lived in Texas, always worked from Pennsylvania, never had an office in Texas, and never received commissions related to business generated in Texas. *Id*. at 527. The trial court found Frey's contacts insufficient to establish personal jurisdiction over her in Texas and sustained the special appearance.

The court of appeals affirmed, holding in part that, when an employee lives and works outside of Texas, employment "by a company with its principal place of business in Texas is not sufficient to establish the requisite minimum contacts with Texas." *Id.* at 530 (quoting *Gustafson v. Provider HealthNet Servs., Inc.*, 118 S.W.3d 479, 483 (Tex. App.—Dallas 2003, no pet.)). The court held that contracting with a Texas company does not necessarily demonstrate purposeful availment of the benefits of Texas law. *Id.* The court found persuasive the trial-court findings that Frey received the job offer in Pennsylvania, was not assigned Texas clients, did not develop clients in Texas, and did not receive commissions for business generated in Texas. *Id.* Further, the contract did not contain a venue provision. *Id.* The court of appeals affirmed the trial court's conclusion that Frey's alleged liability did not arise from and was not related to activity conducted within Texas. *Id.*

The facts of this case show Fox less connected to Texas than Frey was in *Rushmore*. Both worked for Texas-based corporations, occasionally traveled to Texas, and were paid from Texas bank accounts. But Cenoplex was headquartered in California when it hired Fox then moved to Texas, while Rushmore was based in Texas when it hired Frey. Unlike with Frey, there is no evidence that Fox gave any indication (on business cards or governmental forms) that he worked in Texas, had a Texas telephone number, or solicited business in Texas. Fox directed emails and phone calls to Texas at least on a weekly basis—sometimes more often—over nine months,

9

while Frey directed emails and phone calls here daily for twenty-two months. Fox traveled to Texas twice for about twenty-four hours each time, while Frey spent a week in training in Texas and came to Texas for six sales meetings. Fox's employment agreement adopts California law, while Frey's agreement adopts Texas law. If Frey lacked sufficient contacts with Texas as a matter of law, Fox also lacked sufficient contacts to authorize a court to exercise jurisdiction over him.

For similar reasons, the court of appeals in *Brocail* reiterated its holding that "it is difficult to see how a failure to act could meet the purposeful availment requirement needed to establish personal jurisdiction. 132 S.W.3d at 564 (citing *Anderson v. Bechtle*, No. 01-00-00593-CV, 2001 WL 930205, at *2 (Tex. App.—Houston [1st Dist.] Aug. 16, 2001, no pet.) (not designated for publication)). Brocail was a professional baseball player who lived in Texas but played for a team based in Michigan. The team physician operated on him in Detroit in September 2000 and prescribed rehabilitative therapy. *Id.* at 555. The player went home to Houston to rehabilitate. The doctor monitored his progress through reports sent to Michigan by the Texas therapist. The doctor prescribed additional physical therapy, prompted at least once by a suggestion by the Texas therapist. The doctor said he discussed the therapy over the phone with the player and the therapy staff. *Id.* Later, the player sued the Michigan doctor in Texas alleging negligence, gross negligence, and fraud. *Id.* at 556. The trial court sustained the doctor's special appearance, finding that the doctor did not avail himself of the benefits and protection of Texas law by treating a patient who chose to go to Texas while recovering. The court of appeals opined that the doctor's wrongdoing, if any, occurred in Michigan where he did any alleged misdiagnosis or misprescription, not in Texas where his directives were received. *Id.* at 563-64. Any failure to disclose the nature of the player's injury likewise occurred in Michigan. *Id.* at 564. The court of appeals held that the

10

doctor's alleged failure to disclose demonstrated that he did not have the contacts with the patient's home state required to authorize the court to exercise jurisdiction over the doctor. *Id.*

Though the *Brocail* court noted that doctor-patient suits had "special rules" that focus on the place where the doctor makes the medical judgments at issue, *id*. at 559, we find the general contacts analysis informative. Like the doctor in that case, Fox was hired outside of Texas and continued to provide the company services from outside of Texas after it moved to Texas. Like Brocail did with his doctor, Cenoplex seeks to recover for Fox's failures. Unlike Brocail's doctor, Fox at least implicitly consented to the company's move as a member of the board of directors and also visited Texas twice on Cenoplex business. But that first visit occurred in December 2011 before Burnett alleges he began to suspect wrongdoing by Welch. Although Burnett asserted that Fox blocked his attempt to call a board meeting, Fox testified that Burnett did not call for a meeting until he was about to fly back to California. The meeting was held on Monday—two days after it was requested and the earlier of the two days that Burnett requested. The trial court was free to choose to believe Fox's version of events and thus that Fox did not block a meeting while in Texas or elsewhere at that or previous times.

This case is also distinct from cases Cenoplex cites as controlling: *Ennis v. Louiseau*, 164 S.W.3d 698 (Tex. App.—Austin 2005, no pet.); *Wright v. Sage Eng'g, Inc.*, 137 S.W.3d 251 (Tex. App.—Houston [1st Dist.] 2004, pet. denied); *SITQ E.U., Inc. v. Reata Rest's, Inc.*, 111 S.W.3d 638 (Tex. App.—Fort Worth 2003, pet. denied).

In *Ennis*, this Court affirmed the district court's assertion of personal jurisdiction over Ennis, a Florida resident whose companies did business with fraudulent Texas insurance companies. 164 S.W.3d at 701. Ennis agreed that substantial connections existed between his companies and

11

the fraudulent insurers and testified that he was in charge of these companies and their business with the fraudulent insurers. *Id.* at 709. He signed several contracts between the companies and communicated with the Texas-based head of the insurers, Robert Neal, sending "numerous e-mails, facsimiles, and telephone calls" to Texas. *Id.* Although Ennis claimed to believe that Neal's companies were California companies, he admitted traveling to Texas to sign the contracts, that the contracts listed Neal's company's address as being in Texas, and that he communicated with Neal and his employees in Fort Worth. *Id.* at 710. Ennis himself testified that, when he learned that Neal was under regulatory scrutiny, he advised Neal to guard a set of documents from his competitors and to reformat the documents so that they would appear different than the ones given to regulators. *Id.* The alleged scheme affected not just the Texas-based corporation that Ennis's companies were dealing with, but also 409 Texas consumers of the allegedly fraudulent insurance products. *Id.* at 710-11.

In *Wright*, Texas courts exercised jurisdiction over a Swiss man who allegedly directed communications in and toward Texas residents intending to and succeeding in depriving them of their intellectual property. 137 S.W.3d at 250-51. Wright was the sole shareholder of a holding company that itself was one of three founding shareholders of an engineering company that manufactured and sold certain oilfield testing equipment. *Id.* at 244. The two individual shareholders—Texas residents—created the testing equipment and alleged that Wright induced them to contribute it to the engineering company, all the while planning to purchase it through another entity, reverse engineer it, and sell the design revealed to yet another company. *Id.* at 249. The Texas plaintiffs alleged that Wright made numerous oral and written representations to them in Texas that induced them to transfer their intellectual property to a company headquartered and

12

formed under Texas law, thus purposefully availing himself of the benefits and protections of Texas law. *Id.* at 252.

The facts in *SITQ* similarly show significant activity directed toward and allegedly harming Texas residents. In that case, the landlords of a Fort Worth office tower chose not to repair tornado damage, causing termination of the tenants' leases. 111 S.W.3d at 644. The landlord company and its backers came from out of state to view the building before purchasing it. *Id.* at 643. After the tornado, the landlords told tenants that the tower would be rebuilt. Almost four months later, however, the landlords settled with their insurer, collected $80 million, stopped reconstruction, and terminated the leases. *Id.* at 644. The tenants then sued for fraud and other claims. Evidence showed that representatives of the landlords viewed the premises after the tornado and assured tenants that reconstruction would soon be complete, even as they negotiated with the insurance company for a deal that would result in a permanent halt to reconstruction. *Id.* at 648-49. The landlords distributed a newsletter to tenants regarding the progress of reconstruction and containing a representation that the completed building would be better than before dated July 20—the same day that the landlords reached the settlement agreement and decided to stop reconstruction, terminate the leases, and sell or demolish the tower. *Id.* at 649. While there was conflicting evidence regarding the role of each defendant in the overall scheme, the court of appeals affirmed the trial court's conclusion that these facts warranted the exercise of jurisdiction over the out-of-state defendants. *Id.* at 650.

The case currently before us differs primarily in the nature of the relationship between the out-of-state defendant and the Texas businesses and individuals allegedly affected by the misdeeds. Ennis agreed to do business with Texas-based companies and thereby allegedly aided

13

fraud that inflicted harm on 409 Texas residents. *See* 164 S.W.3d at 710-11. The defendant in *Wright* allegedly intentionally sent false information to Texas residents forming a Texas corporation and thereby deprived them of their property. 137 S.W.3d at 252. The defendants in *SITQ* bought a tower in Texas occupied by Texas residents, then allegedly misled the Texas tenants regarding the future of the building while securing a rewarding exit strategy for themselves—a strategy that allegedly had adverse consequences for the Texas tenants. 111 S.W.3d at 650, 653. By contrast, Fox does not appear to have purposefully availed himself of the benefits of doing business in Texas beyond choosing not to resign when the headquarters of the company followed its CEO in moving to Texas. Though two additional staffers were hired, there is no indication that the company changed its operations appreciably due to the move. It did not renegotiate employment contracts or change the designation of the governing law. There is no showing that Fox sought to do business with Texas residents outside of Cenoplex—and, regardless, no such activities are alleged as connected to Cenoplex's causes of action. Although Fox did not demand to see the financial records during his April 2012 visit to Texas, he also did not demand to see them during the other days during which he lived and worked in California. On the facts presented, Fox's alleged failures to act do not show him purposefully availing himself of the laws or benefits of doing business in Texas.

Even if we were persuaded that Fox had sufficient minimum contacts with Texas, we are not persuaded that exercising jurisdiction would be fair under the circumstances. Fox testified that financial pressures, including those from a pending divorce, made it difficult for him to afford the expense of travel to Austin. Cenoplex argued that moving its records from Austin to California would also be burdensome, but it is not clear that the burden of moving its records to its headquarters outweighs the burden on Fox to travel to Texas to defend this lawsuit. Cenoplex noted

14

that potential witnesses Strader, Welch, and Georgen-Saad still live in Austin, which tends to make their appearance in person in court easier here. Cenoplex urges that trying the case in Travis County will foster efficiency because its suit against Welch is pending here, but there is no indication that Cenoplex has sought to consolidate the actions or that overlap in the issues between the suits would lead to judicial efficiencies.[4] While we acknowledge that Texas courts could have an interest in resolving disputes among out-of-state residents based on acts (or failure to act) in Texas, we do not see a compelling Texas interest in this particular dispute. Based on sheer time of stay, Fox is alleged to have taken far more actions (or engaged in far more inaction) in California than he did (or failed to do) in Texas. Since Cenoplex returned its headquarters to California, this is a dispute between California residents. Under Texas law, Cenoplex's fiduciary duty claims will be governed by Delaware law. Fox's employment agreement permits a lawsuit arising out of his employment to be brought in California, and the agreement plainly states that it "shall be governed by and construed in accordance with the laws of the State of California without regard to its principles of conflicts of laws." These provisions tend to favor jurisdiction in a California court rather than a Texas court. *See Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 792 (Tex. 2005) ("insertion of a clause designating a foreign forum suggests that no local availment was intended"); *see also Burger King v. Rudzewicz*, 471 U.S. 462, 482 (1985).

We conclude that the trial court did not err by declining to exercise jurisdiction over this case.

---

[4] Cenoplex urges that the budget crisis in California will result in a delayed trial and that "sending" the case to California will run counter to Texas governmental programs luring businesses from California. Whatever the merits of those contentions may be, Cenoplex has not shown that these arguments and evidence were presented to the trial court. They therefore did not factor into the trial court's decision and cannot be part of our review on appeal. *See* Tex. R. App. P. 33.1.

**Dismissal with prejudice**

Cenoplex contends that the order granting the special appearance is not a determination that the case lacks substantive merit and, therefore, the dismissal should not have been "with prejudice." We agree. *See Schenker v. City of San Antonio*, 369 S.W.2d 626, 630 (Tex. Civ. App.—San Antonio 1963, writ ref'd n.r.e.); *see also Black v. Jackson*, 82 S.W.3d 44, 56 (Tex. App.—Tyler 2002, no pet.) (citing *Mossler v. Shields*, 818 S.W.2d 752, 754 (Tex. 1991)) (concerning dismissal for want of subject-matter jurisdiction). We modify the judgment of the trial court to state that the dismissal of this case is without prejudice.

## CONCLUSION

We modify the trial court's Order Granting Defendant's Special Appearance by removing any statement that the case was dismissed "with prejudice." We affirm the order as modified.

_____

Jeff Rose, Justice

Before Justices Puryear, Rose, and Goodwin

Modified and, as Modified, Affirmed

Filed: February 21, 2014

16