**INFORMATION SERVICES GROUP, INC., Technology Partners International, Inc. and TPI Eurosourcing, L.L.C., Appellants,**

v.

**Tony RAWLINSON, Appellee.**

**No. 14–09–00242–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

Nov. 5, 2009.

John B. Shely, J. Scott Carothers, Houston, Scott A. Brister, Austin, for Appellants.

Merritt B. Chastain, III, Houston, for Appellee.

Panel consists of Justices YATES, FROST, and BROWN.

## OPINION

JEFFREY V. BROWN, Justice.

This is an accelerated, interlocutory appeal from the trial court's order granting appellee Tony Rawlinson's special appearance. In two issues, the appellants Information Services Group, Inc., Technology Partners International, Inc., and TPI Eu-

rosourcing, L.L.C. contend that the trial court erred in granting the special appearance. Because we hold that Rawlinson lacks sufficient minimum contacts to support the assertion of specific jurisdiction, we affirm.

## I

Rawlinson is a former employee of TPI Eurosourcing, L.L.C. ("Eurosourcing"). Rawlinson worked for Eurosourcing from June 2004 until May 2008. Eurosourcing is a Texas limited liability company with operations in the United Kingdom. Rawlinson, a citizen and resident of the U.K., worked for Eurosourcing in the U.K. exclusively. Eurosourcing is a branch or subsidiary of Technology Partners International, Inc. ("Technology Partners"), a Texas corporation that has its principal place of business in The Woodlands, Texas. In 2007, Information Services Group, Inc. ("Information Services"), through a purchase agreement with MCP–TPI Holdings, LLC ("MCP–TPI"),[1] another Texas company, acquired ownership of Information Services and Eurosourcing. Information Services is a Delaware company that has its principal place of business in Connecticut.

In the course of Rawlinson's employment relationship, he entered into employment agreements with Eurosourcing and a confidentiality agreement with Eurosourcing and Technology Partners. He also acquired an ownership interest in MCP–TPI, and executed a non-competition, non-solicitation, and non-disclosure agreement with MCP–TPI. In connection with Information Services's acquisition of Technology Partners and Eurosourcing, Rawlinson executed a subscription agreement in which he agreed to invest part of the sales proceeds he received from his equity interest in MCP–TPI, and he also executed

non-competition, non-solicitation, and non-disclosure agreements with Information Services. Rawlinson also was issued a Eurosourcing computer to access appellants' website and his email account, and he traveled to Texas twice at Eurosourcing's direction for annual conferences.

The address of the Eurosourcing office through which Rawlinson worked is Albany House, Market Street, Maidenhead, Berkshire SL6 8BE, U.K. Rawlinson's employment agreements specified that his primary place of employment was his home in the U.K. and that the agreements were subject to the laws of England and Wales. The confidentiality agreement among Eurosourcing, Technology Partners, and Rawlinson also provided that it was governed by English law and further provided that the parties agreed to submit to the exclusive jurisdiction of the English courts. Rawlinson's agreements with Information Services included choice-of-law provisions specifying that either New York or Delaware law applied. Rawlinson executed his employment agreements and all of the other agreements in the U.K. Rawlinson's communications with Eurosourcing, Technology Partners, or Information Services representatives outside of the U.K. were infrequent and he did not initiate them. Rawlinson was never an employee of Technology Partners or Information Services.

Less than two months after his departure from Eurosourcing, Rawlinson went to work for EquaTerra Europe, Limited, in the U.K. EquaTerra Europe is a subsidiary of EquaTerra, Inc., a Delaware corporation with its principal place of business in Texas. The appellants and EquaTerra, Inc. are competitors in the business of providing various consulting services to companies throughout the United States and Europe. Under the restrictive cove-

---

**1.** MCP–TPI is not a party to the lawsuit below.

nants in his agreements with the appellants, Rawlinson was prohibited from working for a competitor for at least six months after his departure. According to the appellants, after he resigned, Rawlinson also took confidential and proprietary information with him to his new employer in violation of his confidentiality agreements.

In July 2008, the appellants sued Rawlinson and EquaTerra, Inc. in Harris County.[2] The appellants alleged that Rawlinson breached three non-disclosure, non-solicitation, and non-competition agreements. The appellants also alleged that EquaTerra violated two letter agreements containing non-solicitation provisions, and additionally asserted claims of tortious interference, unfair competition, and unjust enrichment against EquaTerra. In response, Rawlinson filed a special appearance. He later amended his special appearance and filed it with a supporting affidavit. The appellants specially excepted to these filings and sought a continuance to take Rawlinson's deposition. Rawlinson then filed an amended special appearance and an amended affidavit After the appellants deposed Rawlinson in Houston, they responded to his special appearance. Following a non-evidentiary hearing, the trial court signed an order on February 24, 2009, granting Rawlinson's special appearance and dismissing him from the case.

## II

### A

▮ Whether a trial court has personal jurisdiction over a defendant is a question of law we review de novo. *Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 574 (Tex.2007); *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 794 (Tex.2002). When, as here, the trial court issues no findings of fact and conclusions of law, all facts necessary to support the judgment and supported by the evidence are implied. *BMC Software,* 83 S.W.3d at 795. But when the appellate record includes the reporter's and clerk's records, parties can challenge the legal and factual sufficiency of these implied factual findings. *BMC Software,* 83 S.W.3d at 795; *Brocail v. Anderson,* 132 S.W.3d 552, 556 (Tex.App.-Houston [14th Dist] 2004, pet. denied).[3]

### B

▮ The plaintiff has the initial burden of pleading sufficient allegations to bring the nonresident defendant within the provisions of the Texas long-arm statute. *BMC Software,* 83 S.W.3d at 793; *Brocail,* 132 S.W.3d at 556. A defendant challenging a Texas court's personal jurisdiction over it must negate all jurisdictional bases alleged. *BMC Software,* 83 S.W.3d at 793; *Nat'l Indus. Sand Ass'n v. Gibson,* 897 S.W.2d 769, 772 (Tex.1995).

### C

▮ Texas courts may exercise jurisdiction over a nonresident if the Texas long-arm statute authorizes the exercise of personal jurisdiction and the exercise of jurisdiction is consistent with federal and

---

**2.** Although it is a defendant below, EquaTerra, Inc. is not a party to this appeal. EquaTerra Europe is not a party to this lawsuit.

**3.** Here, the trial court held a hearing on Rawlinson's special appearance, but we have no reporter's record of the hearing. Because neither party contends the hearing was evidentiary and the record does not indicate otherwise, we will presume that the hearing was non-evidentiary and that the trial court considered only the evidence filed with the clerk. *See Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 784 (Tex.2005).

state constitutional guarantees of due process. *Moki Mac,* 221 S.W.3d at 574; *BMC Software,* 83 S.W.3d at 795. The Texas long-arm statute authorizes Texas courts to exercise jurisdiction over a nonresident defendant who "does business" in the state. Tex. Civ. Prac. & Rem.Code Ann. § 17.042 (Vernon 2008). The Texas Supreme Court has interpreted the broad language of the Texas long-arm statute to extend Texas courts' personal jurisdiction " 'as far as the federal constitutional requirements of due process will allow.' " *BMC Software,* 83 S.W.3d at 795 (quoting *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991)). As a practical matter, therefore, we need consider only whether it is consistent with federal constitutional requirements of due process for Texas courts to assert personal jurisdiction over the nonresident defendant. *Moki Mac,* 221 S.W.3d at 575; *Brocail,* 132 S.W.3d at 557.

■■■ Personal jurisdiction over a nonresident defendant is constitutional when two conditions are met: (1) the defendant has established minimum contacts with the forum state; and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *BMC Software,* 83 S.W.3d at 795. Minimum contacts are sufficient for personal jurisdiction when the nonresident defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. *Int'l Shoe,* 326 U.S. at 319, 66 S.Ct. 154; *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 785 (Tex.2005). Three factors important in determining whether a defendant has purposefully availed itself of the forum are: (1) only the defendant's contacts with

the forum matter, (2) the acts relied on must be purposeful rather than merely fortuitous, and (3) the defendant must seek some benefit, advantage, or profit by availing itself of the forum. *Michiana,* 168 S.W.3d at 784. Because of the unique and onerous burden placed on a party called upon to defend a suit in a foreign legal system, the minimum-contacts analysis is particularly important when the defendant is from a different country. *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 114, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); *BMC Software,* 83 S.W.3d at 795.

## D

■■■ Texas courts may exercise two types of jurisdiction based on a nonresident's contacts with the state. If the defendant has made continuous and systematic contacts with the forum, general jurisdiction is established whether or not the defendant's alleged liability arises from those contacts. *Moki Mac,* 221 S.W.3d at 575; *BMC Software,* 83 S.W.3d at 796. In contrast, when specific jurisdiction is alleged, we focus the minimum-contacts analysis on the relationship among the defendant, the forum, and the litigation. *Moki Mac,* 221 S.W.3d at 575–76. Specific jurisdiction is established if the defendant's alleged liability arises out of or is related to an activity conducted within the forum. *Id.* at 576. For a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation. *Id.* at 580, 585. To identify the operative facts of the litigation, we select those facts that would be the focus of the trial. *See id.; Pulmosan Safety Equip. Corp. v. Lamb,* 273 S.W.3d 829, 839 (Tex.App.-Houston [14th Dist] 2008, pet. denied). Here, the appellants allege only specific jurisdiction.

## III

On appeal, the appellants contend that Rawlinson engaged in acts constituting "doing business" in Texas as provided in the Texas long-arm statute because they alleged that Rawlinson entered into contracts with Texas residents and engaged in other purposeful contacts constituting "doing business" in Texas. *See* Tex. Civ. Prac. & Rem.Code Ann. § 17.042. The appellants also contend that they demonstrated that Rawlinson has constitutionally sufficient minimum contacts to support specific jurisdiction and that the assumption of jurisdiction would not offend traditional notions of fair play and substantial justice.

■ In their original petition, the appellants alleged that Rawlinson was amenable to service of process pursuant to the Texas long-arm statute because he "entered into several contracts with Texas residents that called for performance in part in Texas, including, but not limited to, a contract of employment with [Eurosourcing], a Texas company...." The appellants further alleged that Rawlinson executed a confidentiality agreement with Technology Partners and Eurosourcing, that he agreed not to engage in any competition or perform any services for a competitor, and that his employment with EquaTerra breached three of his agreements with the appellants. Additionally,

the appellants alleged that Rawlinson solicited business from the appellants' clients, solicited the appellants' employees to leave their employment, and took the appellants' confidential information and gave it to EquaTerra.[4] Because the exercise of jurisdiction under the Texas long-arm statute is limited by federal and state due-process requirements, we need only consider whether the assertion of jurisdiction accords with the due-process guarantees. *See Moki Mac,* 221 S.W.3d at 575.

The appellants primarily contend that Rawlinson's various agreements with Texas entities establish minimum contacts. Specifically, the appellants point to Rawlinson's execution of employment agreements with Eurosourcing, a Texas limited-liability company, which incorporated the restrictive covenants in a contemporaneously executed confidentiality agreement with both Eurosourcing and Technology Partners, also a Texas company. Additionally, the appellants allege that Rawlinson entered into two more contracts with MCP–TPI, another Texas limited-liability company "by which he was also employed and in which he owned an equity interest." One of these agreements included restrictive covenants and was governed by Texas law. Further, the appellants contend, the restrictive covenants protected, among other things, the confidential information stored on Texas-based servers that Raw-

---

4. As an initial matter, Rawlinson contends that the appellants failed to plead adequate jurisdictional facts to shift the burden to him to negate every pleaded basis for jurisdiction over him. We disagree. As discussed above, the appellants alleged that Rawlinson entered into contracts with Texas companies calling for performance in part in Texas, and that he breached his agreements with the appellants. The appellants also alleged that Rawlinson "has engaged in significant activities in or related to Texas, [and] has conducted business and negotiated in Texas with Texas residents." Liberally construing the pleadings,

we conclude that the appellants' jurisdictional allegations were sufficient to shift the burden to Rawlinson to negate the jurisdictional allegations. *See* Tex. Civ. Prac. & Rem.Code Ann. § 17.042 (acts that may constitute "doing business" include "contract[ing] by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state"); *Huynh v. Nguyen,* 180 S.W.3d 608, 619–20 (Tex.App.-Houston [14th Dist.] 2005, no pet.) (stating plaintiff's minimal pleading requirement is satisfied by an allegation that the nonresident defendants are doing business in Texas).

linson regularly accessed in the daily performance of his job using a computer Eurosourcing issued to him. Rawlinson's electronic mail was also routed through these same servers. Additionally, Rawlinson also made two trips to Texas as required for his job.

■ These contacts, the appellants contend, show that Rawlinson purposefully availed himself of the privilege of conducting activities within Texas, thereby invoking the benefits and protection of its laws. *See Burger King v. Rudzewicz,* 471 U.S. 462, 475–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). But the appellants do not allege that Rawlinson engaged in any acts constituting a breach of contract in Texas, nor do they explain how the contracts required Rawlinson to conduct activities in Texas. Merely contracting with a Texas company does not constitute purposeful availment for jurisdictional purposes. *See, e.g., IRA Res., Inc. v. Griego,* 221 S.W.3d 592, 597–98 (Tex.2007) (per curiam); *Alenia Spazio, S.p.A. v. Reid,* 130 S.W.3d 201, 213 (Tex, App.-Houston [14th Dist.] 2003, pet. denied); *Shell Compania Argentina de Petroleo, S.A. v. Reef Exploration,* 84 S.W.3d 830, 838 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). Nor does simply being employed by a Texas company. *See, e.g., Gonzalez v. AAG Las Vegas, L.L.C.,* —— S.W.3d ——, —— – —— (Tex.App.-Houston [1st Dist.] 2009, no pet. h.); *Rushmore Inv. Advisors, Inc. v. Frey,* 231 S.W.3d 524, 530 (Tex.App.-Dallas 2007, no pet.); *Gustafson v. Provider HealthNet Servs., Inc.,* 118 S.W.3d 479, 483 (Tex.App.-Dallas 2003, no pet.).

Further, viewed in the context of the appellants' allegations, the Texas contacts the appellants rely on appear more attenuated than purposeful. In their petition, the appellants alleged that Rawlinson breached three agreements: (1) the Confidentiality and Proprietary Information Agreement executed on June 7, 2004 (among Technology Partners, Eurosourcing, and Rawlinson); (2) the Non–Competition, Non–Solicitation, Non–Disclosure and Lock–Up Agreement executed on May 30, 2007 (between Information Services and Rawlinson); and (3) the Restricted Stock Unit Award Agreement and Restrictive Covenant Agreement executed on November 16, 2007 (between Information Services and Rawlinson). The first of these, the Confidentiality and Proprietary Information Agreement, identified Eurosourcing as "a branch [of Technology Partners] registered in England and Wales" and reflected Eurosourcing's and Rawlinson's U.K. addresses. This agreement also specified that it was governed by English law and the parties agreed to submit to the exclusive jurisdiction of the English courts. Moreover, it was ancillary to Rawlinson's employment agreements, which similarly specified that they were governed by the laws of England and Wales. The more recent of the two employment agreements further provided that the parties agreed to submit to the non-exclusive jurisdiction of the English courts. Additionally, although Rawlinson's employment agreements provided that Eurosourcing could require Rawlinson to work or travel outside of the U.K., it designated Rawlinson's "Place of Work" as "your home address in England" and never mentioned Texas as a potential place for performance. The other two agreements allegedly breached were with Information Services, a Delaware corporation, were governed by either New York or Delaware law, and neither of these agreements contemplated performance in Texas.

■ As noted in *Michiana Easy Livin' Country, Inc. v. Holten,* the United States Supreme Court has held that choice-of-law provisions should be considered when determining whether a defen-

dant has purposely availed itself of the benefits and protections of a state's laws. 168 S.W.3d at 792 (citing *Burger King*, 471 U.S. at 482, 105 S.Ct. 2174). Further, the *Michiana* court instructed that "insertion of a clause designating a foreign forum suggests that no local availment was intended." *Id.* Here, the forum-selection clauses, while not dispositive, provide some evidence that no local availment was intended, as does the designation of Rawlinson's place of work as his home address in the U.K. Additionally, Rawlinson also signed these agreements in the U.K., and the appellants do not contend that Rawlinson ever worked for any of them in Texas.

■ The appellants also point out that Rawlinson entered into two agreements with MCP–TPI, a Texas company, and those agreements include a Texas choice-of-law provision. The appellants also focus on Rawlinson's equity interest in MCP–TPI, stressing that an ownership interest in a Texas company is a much more significant contact than mere employment by a Texas company. But MCP–TPI is not a party to the lawsuit, and the appellants have not asserted in their petition that any alleged breach of the agreements with MCP–TPI constitutes a basis for relief in their lawsuit. Accordingly, these contacts are not relevant to the minimum-contacts analysis for specific jurisdiction. *See Yfantis v. Balloun*, 115 S.W.3d 175, 183 (Tex.App.-Fort Worth 2003, no pet.); *Shell Compania Argentina de Petroleo, S.A.*, 84 S.W.3d at 838–39.

■ In addition to contracting with Texas companies, the appellants point to several contacts Rawlinson had with Texas during his employment with Eurosourcing. But these contacts were made at Eurosourcing's direction or were otherwise attenuated or fortuitous. First, appellants point out that Rawlinson was required to travel to Texas to participate in company conferences. Rawlinson traveled to Texas two times, totaling six days, and these two trips were the only times Rawlinson ever traveled to Texas. The appellants presented some evidence that Rawlinson received confidential and proprietary information at the conferences, but they do not allege that Rawlinson's trips to Texas relate in any way to the breach-of-contract claims against him. Further, Rawlinson did not elect to visit Texas; it is undisputed that he attended the conferences at Eurosourcing's direction. Such unilateral activity is insufficient to constitute relevant jurisdictional contacts. *See Gonzalez v. AAG Las Vegas, L.L.C.*, —— S.W.3d at ——–——; *Pelican State Physical Therapy, L.P. v. Bratton*, No. 01–06–00199–CV, 2007 WL 2833303, at *9 (Tex.App.-Houston [1st Dist.] Sept. 27, 2007, no pet.) (mem. op.). Moreover, visits to Texas that are unrelated to the claims asserted are insufficient to establish specific jurisdiction. *See Moki Mac*, 221 S.W.3d at 588.

■ The appellants also presented evidence that Rawlinson accessed confidential and proprietary information—via the company website and email—from company servers that happened to be located in Texas. To support their contention that these contacts are relevant to the minimum-contacts analysis, the appellants cite to *TravelJungle v. American Airlines, Inc.*, 212 S.W.3d 841 (Tex.App.-Fort Worth 2006, no pet.). But *TravelJungle* is inapposite. In that case, the court held that jurisdiction existed because American's causes of action, including trespass of server, were directed to TravelJungle's repeated accessing of American's website to obtain and sell American's fare data. *Id.* at 844, 849–51. TravelJungle was the operator of a travel website that accessed American's website—sometimes as often as 2,972 times per day—and took the information from the website to use for its own

commercial advantage, in direct violation of American's terms of use for its website. *Id.* at 850. The court held that TravelJungle was subject to the jurisdiction of Texas courts because "it purposefully directed its data-gathering activity toward AA.com's servers, which are located in Texas, for commercial, profit-driven purposes; thus, the basis for jurisdiction specifically arises out of the conduct of which American complains." *Id.* at 850.

In contrast, the appellants here do not allege that Rawlinson acted improperly or unlawfully when accessing the servers from the U.K., nor does Rawlinson's access to them form the basis for any of the appellant's claims against him. Further, the appellants unilaterally chose the Texas location for the servers, and it is undisputed that Rawlinson did not know where the servers were located. Therefore, Rawlinson could not have purposefully availed himself of the benefits of conducting business in Texas by accessing the servers from the U.K.[5] In the absence of any allegation that Rawlinson purposefully directed any improper activity towards their servers, Rawlinson's business-related use of appellants' website and email that happened to be routed through servers the appellants chose to locate in Texas is merely fortuitous. Even if we assume that Rawlinson ultimately obtained confidential information from the Texas-based servers and gave it to EquaTerra in breach of the various restrictive covenants with the appellants, there is no allegation or evidence that he did so in Texas. *See Gustafson,* 118 S.W.3d at 484 (Michigan employee's travel to Texas twice for management meetings was not a contact connected to Texas employer's breach of confidentiality agreement claim when employer did not assert that employee breached any duties to it or committed any torts during those meetings). Indeed, Rawlinson averred in his amended supporting affidavit that all negotiations with EquaTerra Europe relating to his current employment took place in the U.K., and the appellants do not challenge this testimony.

■ Appellants also argue that Rawlinson's employment-related contacts created "continuing relationships and obligations" with Texas entities subjecting him to jurisdiction in Texas to face the consequences of his activities. *See Burger King,* 471 U.S. at 473, 105 S.Ct. 2174. For this proposition, appellants primarily rely on *Burger King* and a case from this court, *Lathrop v. Personalysis Corp.,* No. 14–06–00074–CV, 2006 WL 3072072 (Tex.App.-Houston [14th Dist.] Oct. 31, 2006, no pet.) (mem. op.). Both cases are distinguishable.

■ *Burger King* instructs that we must look not merely to a party's contract

---

5. TravelJungle also contended that it could not be subject to personal jurisdiction because it did not know where American's servers were located, but the court rejected TravelJungle's contention, concluding that TravelJungle purposefully directed its activities to American's website and so "should have been aware" that it would be subject to jurisdiction in any forum where the website's servers were located. *See TravelJungle,* 212 S.W.3d at 851. In reaching this conclusion, the court drew an analogy to federal cases in which senders of spam emails were held to be subject to personal jurisdiction in the forum in which their emails were received or where the servers processing those emails were located because the senders purposefully targeted email addresses using a particular server and so assumed the risk that they would be haled into a forum where that server is located. *See id.* at 850–51. In contrast, this case involves no allegations or evidence that Rawlinson purposefully directed any improper activities toward Technology Partners's website or servers, and the facts are not analogous to those involving mass spam emails. Therefore, we do not similarly discount Rawlinson's assertion that he did not know the location of Technology Partners's servers.

with the nonresident; we must also examine the factors surrounding the contract—prior negotiations and contemplated future consequences, the terms of the contract, and the parties' actual course of dealing—to determine whether the nonresident purposefully established minimum contacts within the forum. 471 U.S. at 479, 105 S.Ct. 2174. In that case, Burger King sued Rudzewicz, a franchisee, for breach of the franchise agreement's payment provision and for trademark infringement. *Id.* at 468–69, 105 S.Ct. 2174. Burger King alleged that Rudzewicz failed to make required monthly payments and continued to use the Burger King trademarks at his restaurant after the franchise was terminated. *Id.* Burger King sued in Florida, the location of its headquarters, even though Rudzewicz's franchise was in Michigan. *Id.* at 466, 105 S.Ct. 2174. Rudzewicz argued that he was not subject to personal jurisdiction in Florida because his restaurant was located in Michigan and he had never even visited Florida. *Id.* at 469, 479, 105 S.Ct. 2174. The Court concluded that "this franchise dispute grew directly out of " 'a contract which had a substantial connection with that State.' " " *Id.* at 479, 105 S.Ct. 2174 (quoting *McGee v. Int'l Life Ins. Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957)). In reaching its conclusion, the Court noted that Rudzewicz had "[e]schew[ed] the option of operating an independent local enterprise," and instead deliberately " 'reached out beyond' Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization." *Id.* at 479–80, 105 S.Ct. 2174. The Court also explained that in light of Rudzewicz's "voluntary acceptance of the long-term and exacting regulation of his business" from Burger King's Miami headquarters, the quality and nature of his relationship to the company in Florida could in no sense be viewed as random, fortuitous, and attenuated. *Id.* at 480, 105 S.Ct. 2174. Further, Rudzewicz's default on the required payments to the Florida home office and his illegal use of Burger King's trademarks "caused foreseeable injuries to the corporation in Florida" and therefore "it was, at the very least, presumptively reasonable for Rudzewicz to be called to account there for such injuries." *Id.*

Similarly, in *Lathrop v. Personalysis Corp.,* Lathrop, a Washington resident, was hired by Manatech, a Washington corporation with its principal place of business in Washington. 2006 WL 3072072, at *1. Manatech was a licensee of Personalysis, a Texas corporation, and as such, Manatech was an authorized distributor of the Personalysis personality test and related consulting services. *Id.* Lathrop often worked directly with Personalysis, selling its tests, using its services to score the tests, and eventually signing a license agreement governed by Texas law. 2006 WL 3072072, at *1–2. Lathrop later reverse-engineered the test in direct violation of the license agreement and began selling it as his own product. *Id.* at *2. Personalysis sued Lathrop in Texas, alleging that Lathrop used information learned during his training sessions in Texas to reverse engineer the scoring methodology of the Personalysis test. *Id.* This court concluded that Lathrop's continuing relationship with Personalysis resembled the franchising relationship in *Burger King* because the license agreement between Lathrop and Personalysis provided that it was governed by Texas law; the agreement contemplated that Personalysis would train Lathrop to use its system; Lathrop's agreement with Manatech specifically called for training sessions in Houston; Lathrop contractually agreed to follow Personalysis's procedures, policies,

standards, and materials; and Manatech, the local licensee, monitored Lathrop's day-to-day activities much like the local district office that reported to Burger King in Florida. *Id.* at 6–8.

We conclude that the facts of the present case are substantially different from those in *Burger King* and *Lathrop*. Here, Rawlinson was a U.K. employee of Eurosourcing, a European branch of Technology Partners, and he was not a franchisee or licensee of Technology Partners. The record evidence shows that, other than two required trips to Texas for company conferences and infrequent communications initiated from Texas, Rawlinson's employment activities occurred exclusively in the U.K. Further, Rawlinson did not "reach out" to Texas by seeking employment in Texas; he averred that he did not solicit employment or business in Texas and there is no contrary evidence. And, as noted above, Rawlinson's confidentiality agreement with Eurosourcing and Technology Partners, which is one of the agreements the appellants allege Rawlinson breached, provided that it was governed by English law and the parties were subject to the exclusive jurisdiction of the English courts. More importantly, there is no evidence that Rawlinson's employment with Eurosourcing in the U.K. contemplated a relationship with Technology Partners in Texas akin to the continued direct oversight and compliance that Burger King and Personalysis required of their franchisees and licensees. Examining the factors surrounding Rawlinson's contracts with Eurosourcing and Technology Partners, including prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing, *see Burger King*, 471 U.S. at 479, 105 S.Ct. 2174, we cannot conclude that Rawlinson purposefully established minimum contacts with Texas

through a continuing relationship with Technology Partners in Texas.

Moreover, as our supreme court explained in *Moki Mac*, there must be a substantial connection between the alleged contacts and the operative facts of the litigation. *Moki Mac*, 221 S.W.3d at 585. Here, the appellants allege that Rawlinson breached contracts containing non-compete, non-solicitation, and non-disclosure covenants by, among other things, accepting employment with the appellants' competitor, contacting or soliciting business from the appellants' clients, taking confidential and proprietary information from the appellants, and providing such information to EquaTerra or its affiliates. On the facts before us, the majority of the focus of any trial would be directed to Rawlinson's alleged wrongdoing in the U.K., not Texas. It is undisputed that Rawlinson lived and worked in the U.K., entered into his contracts with appellants in the U.K., worked for Eurosourcing in the U.K., negotiated his employment with EquaTerra Europe in the U.K., and now works for EquaTerra Europe in the U.K. If Rawlinson contacted the appellants' clients or provided the appellants' confidential information to EquaTerra or its affiliates, there is no evidence to suggest that he would have done so anywhere but in the U.K.

The appellants assert that minimum contacts are established by Rawlinson's contracts with and employment by Texas companies, his two trips to Texas for company conferences, his access to the appellants' servers in Texas through his use of the appellants' website and his email account, and his occasional communications with the appellants' representatives outside of the U.K. But these contacts are not substantially connected to the operative facts of a trial based on the appellants' allegations. Although Rawlinson may

have received confidential and proprietary information at the Texas conferences or obtained it by remotely accessing the appellants' Texas servers, the appellants do not identify the confidential information Rawlinson allegedly provided to EquaTerra (or its affiliates) and they do not allege that Rawlinson gave confidential information to EquaTerra in Texas. Even assuming that Rawlinson's employment-related contacts were sufficient to demonstrate purposeful availment, they do not create a substantial connection to the operative facts of the litigation. *See Moki Mac,* 221 S.W.3d at 585–88. Therefore, Rawlinson lacks sufficient minimum contacts to enable a Texas court to assert personal jurisdiction over him.

Other courts have reached the same conclusion in analogous cases. For example, in *Gonzalez v. AAG Las Vegas, L.L.C.,* Gonzalez was employed in Ohio at an automotive dealership when an officer of Ascent Automotive Group, L.P., a Delaware partnership located in Houston, approached him about a management position with an Ohio Lexus dealership. —— S.W.3d at ——. Gonzalez traveled to Houston to interview for the position, and while there he was asked to invest in two Ohio dealerships and allegedly was offered the right to earn an ownership interest in the dealerships. *Id.* Gonzalez became the general manager of one of the dealerships, and as such he reported to Texas, received his pay from Texas, and regularly telephoned Houston to report on the status of the dealership. *Id.* AAG Las Vegas then hired Gonzalez to be the general manager of a Las Vegas Lexus dealership, and Gonzalez moved from Ohio to Las Vegas for the job. While there, he traveled to Houston to attend a general manager's meeting. *Id.* After about a year, AAG Las Vegas terminated Gonzalez and sued him for breach of the duty of loyalty, usurpation of corporate opportunities, and a declaratory

judgment that he was not entitled to an ownership interest in the Ohio and Las Vegas dealerships. *Id.* at ——, ——. The trial court denied Gonzalez's special appearance, but the court of appeals held that the employment-related contacts the appellants asserted lacked a sufficient connection to the litigation's operative facts. *Id.* at ——. Based on the appellants' pleadings, the court determined that the operative facts of their claims concerned Gonzalez's acts while general manager in Las Vegas, and that Gonzalez's employment-related contacts with Texas were "minimal." *Id.* at —— – ——. Accordingly, the court held that Gonzalez lacked sufficient minimum contacts to support the assertion of specific jurisdiction in Texas. *Id.* at ——.

Likewise, in *Rushmore Investment Advisors, Inc. v. Frey,* the Pennsylvania employee of a Texas company was sued in Texas for breach of an employment contract, misappropriation of trade secrets, and unfair competition. 231 S.W.3d at 526–27. The employer, Rushmore, contended that specific jurisdiction was proper over Frey, the former employee, because she had entered into a written employment agreement in Texas and was employed by a Texas firm for twenty-two months. *Id.* at 529–30. Rushmore also contended that Frey represented to clients and federal agencies that she worked in Texas, made trips to Texas for work, maintained contact with clients in Texas, and signed an employment agreement providing that Texas law would govern any disputes between the parties. *Id.* at 527. The court upheld the trial court's dismissal for lack of personal jurisdiction because "merely contracting with a Texas company does not necessarily constitute purposeful availment for jurisdictional purposes" and because "Frey's alleged liability did not

arise from and was not related to activity conducted within Texas," but rather her activities in Pennsylvania. *Id.* at 530.

In *Pelican State Physical Therapy, L.P. v. Bratton*, the court of appeals affirmed the grant of a special appearance even though the Louisiana-based defendant entered into employment contracts with his Texas employer that contained, among other provisions, non-compete, non-solicitation, and non-disclosure covenants; the employee had taken many trips to Texas to attend company meetings; and he had extensive communications with the employer's personnel in Texas. *See* 2007 WL 2833303, at *4–6. In that case, Bratton managed a physical-therapy clinic in Louisiana for his Texas employer, Pelican State. *Id.* at *3. When Bratton resigned his employment and opened a competing clinic in Louisiana, Pelican State sued him in Texas for breach of his employment contract. *Id.* at *4. Pelican State argued that Bratton was subject to personal jurisdiction in Texas because Bratton's regular business contacts and communications with its parent company's Houston office created continuing obligations with a Texas resident. *Id.* at *7. Through these obligations, Pelican State argued, Bratton derived substantial personal benefits and thus availed himself of the privilege of conducting business in Texas. *Id.* The court rejected this argument, explaining that the status of employment and the signing and possible breach of an employment agreement were not "continuing obligations" sufficient to establish the substantial connection required to support the exercise of personal jurisdiction. *Id.* at *7–9. Further, the court concluded that Pelican State's allegations and the evidence showed that Pelican State's lawsuit involved acts in Louisiana, and thus Pelican State's asserted Texas contacts were not substantially related to the litigation's operative facts. *See id.* at *8–9.

In another analogous case, *Gustafson v. Provider HealthNet Services, Inc.*, the court of appeals rejected a Texas employer's assertion that specific jurisdiction existed over its former Michigan employee because the employment relationship created "continuing obligations" with Texas. *See* 118 S.W.3d at 484. PHNS, a Delaware company with its principal place of business in Texas, hired Gustafson, a Michigan resident, to provide outsourcing services to a Michigan hospital. *Id.* at 481. PHNS later terminated Gustafson's employment and sued him in Texas for breach of his confidentiality agreement, misappropriation of trade secrets and business information, and breach of fiduciary duties. *Id.* PHNS pointed to the following contacts to show specific jurisdiction over Gustafson: (1) the employment relationship itself; (2) two short visits to Texas associated with Gustafson's employment; (3) Gustafson was paid from a Texas bank; (4) Gustafson submitted requests for reimbursement to PHNS's Texas office and cashed checks for reimbursement that were drawn off a Texas bank; (5) Gustafson communicated with PHNS's employees that were located in Texas; (6) Gustafson's health benefits were administered from PHNS's Texas offices; (7) Gustafson's health insurance was through Blue Cross Blue Shield of Texas; and (8) insurance agents located in Texas administered Gustafson's dental and life insurance. *Id.* at 483.

The *Gustafson* court determined that, based on the claims alleged, these contacts were not sufficient to establish specific jurisdiction because the contacts were not "connected to Gustafson's execution of the confidentiality agreement, or his dissemination of confidential information, both of which occurred in Michigan." *Id.* at 484. The court went on to reject PHNS's assertion that "continuing obligations" arising

from the employment relationship established jurisdiction. *Id.* The court expressly distinguished *Burger King,* noting that in *Burger King* the contract between the franchisor and franchisee required performance in the forum state and the agreement expressly provided that it was governed by the forum state's law. *Id.* In contrast, Gustafson had not signed an employment agreement, but he did sign a confidentiality agreement that was executed in Michigan, made no reference to Texas, and did not require any performance in Texas. *Id.* Lastly, the court recognized that a breach of the confidentiality agreement "could cause an injury in Texas," but concluded that "the mere fact that an injury is caused in the forum state is insufficient to establish minimum contacts." *Id.*

■■■ In an effort to identify contacts substantially connected to the litigation's operative facts, the appellants contend that Rawlinson failed to negate all bases of jurisdiction alleged against him because he has provided no evidence to show that the various agreements and restrictive covenants did not require performance in Texas. By this argument, the appellants appear to suggest that Texas has personal jurisdiction over Rawlinson because he was contractually prohibited from competing against Technology Partners in Texas—and apparently anywhere else in the world. Consequently, the appellants argue, the covenants require performance in Texas and so personal jurisdiction is proper here. The appellants also stress that Rawlinson has admitted that he breached the non-compete agreements, but we do not consider the merits of appellants' claims when conducting a personal-jurisdiction analysis. *See Weldon–Francke v. Fisher,* 237 S.W.3d 789, 792 (Tex.App.-Houston [14th Dist.] 2007, no pet.).

■■■ We disagree that a nonresident may be automatically subject to personal jurisdiction in any forum in which he is prohibited from engaging in business based on a non-compete agreement, without regard to whether he actually engaged in competitive activities in the forum or otherwise lacked minimum contacts. Further, we conclude that an agreement not to compete in a forum is more properly viewed as an agreement to refrain from performance in the forum rather than a contact with the forum. As one court explained:

"If the question is whether an individual's contract with an out of state party alone can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer is clearly that it cannot." *This holding must apply with particular force where the contract is one to refrain from doing an act in Texas.*

*Dowdy v. Miller,* 122 S.W.3d 816, 822 (Tex. App.-Amarillo 2003, no pet.) (quoting *Burger King,* 471 U.S. at 478, 105 S.Ct. 2174)) (emphasis added); *see also Brocail,* 132 S.W.3d at 564 (" '[I]t is difficult to see how a failure to act could meet the purposeful availment requirement needed to establish personal jurisdiction.' ") (citing *Anderson v. Bechtle,* No. 01–00593–CV, 2001 WL 930205, at *2 ((Tex.App.-Houston [1st Dist.] Aug. 16, 2001, no pet.) (not designated for publication)). Therefore, we decline to adopt a position that an employee, by agreeing to a non-compete or non-solicitation agreement, is effectively consenting to jurisdiction as far-reaching as the scope of the agreement, which in this case is worldwide. It cannot be enough that Rawlinson simply agreed not to compete or solicit clients in Texas. To hold otherwise would supplant the minimum-contacts analysis and thus vitiate the due-process requirements for personal jurisdiction.

Based on the foregoing, we hold that the trial court did not err in granting Rawlinson's special appearance and dismissing him from the case because Rawlinson lacks the minimum contacts required for the trial court to exercise personal jurisdiction over him. Therefore, we do not consider whether the exercise of personal jurisdiction over him comports with traditional notions of fair play and substantial justice.

* * *

We affirm the trial court's judgment.