Affirmed and Opinion filed November
5, 2009

In
The

Fourteenth
Court of Appeals



NO. 14-09-00242-CV



Information
Services Group, Inc., Technology Partners International, Inc. and TPI
Eurosourcing, L.L.C., Appellants 

v.

Tony Rawlinson,
Appellee 



On Appeal from
the 61st District Court

Harris County, Texas

Trial Court
Cause No. 2008-44979



 

OPINION

            This is an
accelerated, interlocutory appeal from the trial court’s order granting
appellee Tony Rawlinson’s special appearance.  In two issues, the appellants Information
Services Group, Inc., Technology Partners International, Inc., and TPI
Eurosourcing, L.L.C. contend that the trial court erred in granting the special
appearance.  Because we hold that Rawlinson lacks sufficient minimum contacts to
support the assertion of specific jurisdiction,  we affirm.




I

            Rawlinson is a
former employee of TPI Eurosourcing, L.L.C. (“Eurosourcing”).  Rawlinson worked
for Eurosourcing from June 2004 until May 2008.  Eurosourcing is a Texas
limited liability company with operations in the United Kingdom.  Rawlinson, a
citizen and resident of the U.K., worked for Eurosourcing in the U.K.
exclusively.  Eurosourcing is a branch or subsidiary of Technology Partners
International, Inc. (“Technology Partners”), a Texas corporation that has its
principal place of business in The Woodlands, Texas.  In 2007, Information
Services Group, Inc. (“Information Services”), through a purchase agreement
with MCP-TPI Holdings, LLC (“MCP-TPI”),[1]
another Texas company, acquired ownership of Information Services and Eurosourcing. 
Information Services is a Delaware company that has its principal place of business
in Connecticut.  

            In the course of Rawlinson’s
employment relationship, he entered into employment agreements with Eurosourcing
and a confidentiality agreement with Eurosourcing and Technology Partners.  He
also acquired an ownership interest in MCP-TPI, and executed a non-competition,
non-solicitation, and non-disclosure agreement with MCP-TPI.  In connection
with Information Services’s acquisition of Technology Partners and Eurosourcing,
Rawlinson executed a subscription agreement in which he agreed to invest part
of the sales proceeds he received from his equity interest in MCP-TPI, and he
also executed non-competition, non-solicitation, and non-disclosure agreements with
Information Services.  Rawlinson also was issued a Eurosourcing computer to
access appellants’ website and his email account, and he traveled to Texas
twice at Eurosourcing’s direction for annual conferences. 

            The address of
the Eurosourcing office through which Rawlinson worked is Albany House, Market
Street, Maidenhead, Berkshire SL6 8BE, U.K.  Rawlinson’s employment agreements
specified that his primary place of employment was his home in the U.K. and
that the agreements were subject to the laws of England and Wales.  The
confidentiality agreement among Eurosourcing, Technology Partners, and
Rawlinson also provided that it was governed by English law and further
provided that the parties agreed to submit to the exclusive jurisdiction of the
English courts.  Rawlinson’s agreements with Information Services included
choice-of-law provisions specifying that either New York or Delaware law
applied.  Rawlinson executed his employment agreements and all of the other
agreements in the U.K.  Rawlinson’s communications with Eurosourcing, Technology
Partners, or Information Services representatives outside of the U.K. were
infrequent and he did not initiate them.  Rawlinson was never an employee of Technology
Partners or Information Services.

            Less than two months
after his departure from Eurosourcing, Rawlinson went to work for EquaTerra
Europe, Limited, in the U.K.  EquaTerra Europe is a subsidiary of EquaTerra,
Inc., a Delaware corporation with its principal place of business in Texas.  The
appellants and Equaterra, Inc. are competitors in the business of providing
various consulting services to companies throughout the United States and
Europe.  Under the restrictive covenants in his agreements with the appellants,
Rawlinson was prohibited from working for a competitor for at least six months
after his departure.  According to the appellants, after he resigned, Rawlinson
also took confidential and proprietary information with him to his new employer
in violation of his confidentiality agreements.

            In July 2008, the
appellants sued Rawlinson and Equaterra, Inc. in Harris County.[2]  The appellants
alleged that Rawlinson breached three non-disclosure, non-solicitation, and
non-competition agreements.  The appellants also alleged that EquaTerra
violated two letter agreements containing non-solicitation provisions, and
additionally asserted claims of tortious interference, unfair competition, and
unjust enrichment against EquaTerra.  In response, Rawlinson filed a special
appearance.  He later amended his special appearance and filed it with a
supporting affidavit.  The appellants specially excepted to these filings and
sought a continuance to take Rawlinson’s deposition.  Rawlinson then filed an
amended special appearance and an amended affidavit.  After the appellants
deposed Rawlinson in Houston, they responded to his special appearance. 
Following a non-evidentiary hearing, the trial court signed an order on
February 24, 2009, granting Rawlinson’s special appearance and dismissing him
from the case.

II

A

Whether a trial court has personal jurisdiction over
a defendant is a question of law we review de novo.  Moki Mac River
Expeditions v. Drugg, 221 S.W.3d 569, 574 (Tex. 2007); BMC Software
Belgium, N.V. v. Marchand, 83 S.W.3d 789, 794 (Tex. 2002).  When, as here,
the trial court issues no findings of fact and conclusions of law, all facts
necessary to support the judgment and supported by the evidence are implied.  BMC
Software, 83 S.W.3d at 795.  But when the appellate record includes the reporter’s
and clerk’s records, parties can challenge the legal and factual sufficiency of
these implied factual findings.  BMC Software, 83 S.W.3d at 795; Brocail
v. Anderson, 132 S.W.3d 552, 556 (Tex. App.—Houston [14th Dist.] 2004, pet.
denied).[3]

B

The plaintiff has the initial burden of pleading
sufficient allegations to bring the nonresident defendant within the provisions
of the Texas long-arm statute.  BMC Software, 83 S.W.3d at 793; Brocail,
132 S.W.3d at 556.  A defendant challenging a Texas court’s personal
jurisdiction over it must negate all jurisdictional bases alleged.  BMC
Software, 83 S.W.3d at 793; Nat’l Indus. Sand Ass’n v. Gibson, 897
S.W.2d 769, 772 (Tex. 1995).

C

Texas courts may exercise jurisdiction over a
nonresident if the Texas long-arm statute authorizes the exercise of personal
jurisdiction and the exercise of jurisdiction is consistent with federal and
state constitutional guarantees of due process.  Moki Mac, 221
S.W.3d at 574); BMC Software, 83 S.W.3d at 795.  The Texas long-arm statute
authorizes Texas courts to exercise jurisdiction over a nonresident defendant
who “does business” in the state.  Tex. Civ. Prac. & Rem. Code Ann. §
17.042 (Vernon 2008).  The Texas Supreme Court has interpreted the broad
language of the Texas long-arm statute to extend Texas courts’ personal
jurisdiction “‘as far as the federal constitutional requirements of due process
will allow.’”  BMC Software, 83 S.W.3d at 795 (quoting Guardian Royal
Exch. Assurance, Ltd. v. English China Clays, P.L.C., 815 S.W.2d 223, 226
(Tex. 1991)).  As a practical matter, therefore, we need consider only whether
it is consistent with federal constitutional requirements of due process for
Texas courts to assert personal jurisdiction over the nonresident defendant.  Moki
Mac, 221 S.W.3d at 575; Brocail, 132 S.W.3d at 557.

Personal jurisdiction over a nonresident defendant is
constitutional when two conditions are met: (1) the defendant has established
minimum contacts with the forum state; and (2) the exercise of jurisdiction comports
with traditional notions of fair play and substantial justice.  Int’l Shoe
Co. v. Washington, 326 U.S. 310, 316 (1945); BMC Software, 83 S.W.3d
at 795.  Minimum contacts are sufficient for personal jurisdiction when the
nonresident defendant purposefully avails itself of the privilege of conducting
activities within the forum state, thus invoking the benefits and protections
of its laws.  Int’l Shoe, 326 U.S. at 319; Michiana Easy Livin’
Country, Inc. v. Holten, 168 S.W.3d 777, 785 (Tex. 2005).  Three factors
important in determining whether a defendant has purposefully availed itself of
the forum are: (1) only the defendant’s contacts with the forum matter, (2) the
acts relied on must be purposeful rather than merely fortuitous, and (3) the
defendant must seek some benefit, advantage, or profit by availing itself of
the forum.  Michiana, 168 S.W.3d at 784.  Because of the unique and
onerous burden placed on a party called upon to defend a suit in a foreign
legal system, the minimum-contacts analysis is particularly important when the
defendant is from a different country.  Asahi Metal Indus. Co. v. Superior
Court, 480 U.S. 102, 114 (1987); BMC Software, 83 S.W.3d at 795.  

D

Texas courts may exercise two types of jurisdiction
based on a nonresident’s contacts with the state.  If the defendant has made
continuous and systematic contacts with the forum, general jurisdiction is
established whether or not the defendant’s alleged liability arises from those
contacts.  Moki Mac, 221 S.W.3d at 575; BMC Software, 83 S.W.3d
at 796.  In contrast, when specific jurisdiction is alleged, we focus the
minimum-contacts analysis on the relationship among the defendant, the forum,
and the litigation.  Moki Mac, 221 S.W.3d at 575–76.  Specific
jurisdiction is established if the defendant’s alleged liability arises out of
or is related to an activity conducted within the forum.  Id. at 576.  For
a nonresident defendant’s forum contacts to support an exercise of specific
jurisdiction, there must be a substantial connection between those contacts and
the operative facts of the litigation.  Id. at 580, 585.  To identify
the operative facts of the litigation, we select those facts that would be the
focus of the trial.  See id.; Pulmosan Safety Equip. Corp. v. Lamb,
273 S.W.3d 829, 839 (Tex. App.—Houston [14th Dist.] 2008, pet. denied).  Here, the
appellants allege only specific jurisdiction.

III

            On appeal, the appellants
contend that Rawlinson engaged in acts constituting “doing business” in Texas
as provided in the Texas long-arm statute because they alleged that Rawlinson
entered into contracts with Texas residents and engaged in other purposeful
contacts constituting “doing business” in Texas.  See Tex. Civ. Prac.
& Rem. Code Ann. § 17.042.  The appellants also contend that they
demonstrated that Rawlinson has constitutionally sufficient minimum contacts to
support specific jurisdiction and that the assumption of jurisdiction would not
offend traditional notions of fair play and substantial justice.  

            In their original
petition, the appellants alleged that Rawlinson was amenable to service of
process pursuant to the Texas long-arm statute because he “entered into several
contracts with Texas residents that called for performance in part in Texas,
including, but not limited to, a contract of employment with [Eurosourcing], a
Texas company . . . .”  The appellants further alleged that Rawlinson executed
a confidentiality agreement with Technology Partners and Eurosourcing, that he
agreed not to engage in any competition or perform any services for a
competitor, and that his employment with EquaTerra breached three of his
agreements with the appellants.  Additionally, the appellants alleged that
Rawlinson solicited business from the appellants’ clients, solicited the appellants’
employees to leave their employment, and took the appellants’ confidential
information and gave it to EquaTerra.[4] 
Because the exercise of jurisdiction under the Texas long-arm statute is
limited by federal and state due-process requirements, we need only consider
whether the assertion of jurisdiction accords with the due-process guarantees. 
See Moki Mac, 221 S.W.3d at 575.

            The appellants
primarily contend that Rawlinson’s various agreements with Texas entities
establish minimum contacts.  Specifically, the appellants point to Rawlinson’s
execution of employment agreements with Eurosourcing, a Texas limited-liability
company, which incorporated the restrictive covenants in a contemporaneously
executed confidentiality agreement with both Eurosourcing and Technology
Partners, also a Texas company.  Additionally, the appellants allege that Rawlinson
entered into two more contracts with MCP-TPI, another Texas limited-liability
company “by which he was also employed and in which he owned an equity
interest.”  One of these agreements included restrictive covenants and was
governed by Texas law.  Further, the appellants contend, the restrictive
covenants protected, among other things, the confidential information stored on
Texas-based servers that Rawlinson regularly accessed in the daily performance
of his job using a computer Eurosourcing issued to him.  Rawlinson’s electronic
mail was also routed through these same servers.  Additionally, Rawlinson also
made two trips to Texas as required for his job.  

            These contacts, the
appellants contend, show that Rawlinson purposefully availed himself of the
privilege of conducting activities within Texas, thereby invoking the benefits
and protection of its laws.  See Burger King v. Rudzewicz, 471 U.S. 462,
475–76 (1985).  But the appellants do not allege that Rawlinson engaged in any
acts constituting a breach of contract in Texas, nor do they explain how the
contracts required Rawlinson to conduct activities in Texas.  Merely contracting
with a Texas company does not constitute purposeful availment for
jurisdictional purposes.  See, e.g., IRA Res., Inc. v. Griego,
221 S.W.3d 592, 597–98 (Tex. 2007) (per curiam); Alenia Spazio, S.P.A. v.
Reid, 130 S.W.3d 201, 213 (Tex. App.—Houston [14th Dist.] 2003, pet.
denied); Shell Compania Argentina de Petroleo, S.A. v. Reef Exploration,
84 S.W.3d 830, 838 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).  Nor does
simply being employed by a Texas company.  See, e.g., Gonzalez
v. AAG Las Vegas, L.L.C., ___ S.W.3d ___, No. 01-08-00377-CV, 2009 WL 3490989,
*4–5 (Tex. App.—Houston [1st Dist.] October 29, 2009, no pet. h.); Rushmore
Inv. Advisors, Inc. v Frey, 231 S.W.3d 524, 530 (Tex. App.—Dallas 2007, no
pet.); Gustafson v. Provider HealthNet Servs., Inc., 118 S.W.3d 479, 483
(Tex. App.—Dallas 2003, no pet.). 

            Further, viewed
in the context of the appellants’ allegations, the Texas contacts the appellants
rely on appear more attenuated than purposeful.  In their petition, the appellants
alleged that Rawlinson breached three agreements:  (1) the Confidentiality and
Proprietary Information Agreement executed on June 7, 2004 (among Technology
Partners, Eurosourcing, and Rawlinson); (2) the Non-Competition,
Non-Solicitation, Non-Disclosure and Lock-Up Agreement executed on May 30, 2007
(between Information Services and Rawlinson); and (3) the Restricted Stock Unit
Award Agreement and Restrictive Covenant Agreement executed on November 16,
2007 (between Information Services and Rawlinson).  The first of these, the
Confidentiality and Proprietary Information Agreement, identified Eurosourcing
as “a branch [of Technology Partners] registered in England and Wales” and reflected
Eurosourcing’s and Rawlinson’s U.K. addresses.  This agreement also specified
that it was governed by English law and the parties agreed to submit to the
exclusive jurisdiction of the English courts.  Moreover, it was ancillary to
Rawlinson’s employment agreements, which similarly specified that they were governed
by the laws of England and Wales.  The more recent of the two employment
agreements further provided that the parties agreed to submit to the non-exclusive
jurisdiction of the English courts.  Additionally, although Rawlinson’s
employment agreements provided that Eurosourcing could require Rawlinson to
work or travel outside of the U.K., it designated Rawlinson’s “Place of Work” as
“your home address in England” and never mentioned Texas as a potential place
for performance.  The other two agreements allegedly breached were with Information
Services, a Delaware corporation, were governed by either New York or Delaware
law, and neither of these agreements contemplated performance in Texas.  

            As noted in Michiana
Easy Livin’ Country, Inc. v. Holten, the United States Supreme Court has
held that choice-of-law provisions should be considered when determining whether
a defendant has purposely availed itself of the benefits and protections of a
state’s laws.  168 S.W.3d at 792 (citing Burger King, 471 U.S. at 482). 
Further, the Michiana court instructed that “insertion of a clause
designating a foreign forum suggests that no local availment was intended.”  Id. 
Here, the forum-selection clauses, while not dispositive, provide some evidence
that no local availment was intended, as does the designation of Rawlinson’s place
of work as his home address in the U.K.  Additionally, Rawlinson also signed
these agreements in the U.K., and the appellants do not contend that Rawlinson
ever worked for any of them in Texas. 

            The appellants also
point out that Rawlinson entered into two agreements with MCP-TPI, a Texas
company, and those agreements include a Texas choice-of-law provision.  The
appellants also focus on Rawlinson’s equity interest in MCP-TPI, stressing that
an ownership interest in a Texas company is a much more significant contact than
mere employment by a Texas company.  But MCP-TPI is not a party to the lawsuit,
and the appellants have not asserted in their petition that any alleged breach
of the agreements with MCP-TPI constitutes a basis for relief in their
lawsuit.  Accordingly, these contacts are not relevant to the minimum-contacts
analysis for specific jurisdiction.  See Yfantis v. Balloun, 115 S.W.3d
175, 183 (Tex. App.—Fort Worth 2003, no pet.); Shell Compania Argentina de
Petroleo, S.A., 84 S.W.3d at 838–39.

            In addition to
contracting with Texas companies, the appellants point to several contacts
Rawlinson had with Texas during his employment with Eurosourcing.  But these
contacts were made at Eurosourcing’s direction or were otherwise attenuated or
fortuitous.  First, appellants point out that Rawlinson was required to travel to
Texas to participate in company conferences.  Rawlinson traveled to Texas two
times, totaling six days, and these two trips were the only times Rawlinson ever
traveled to Texas.  The appellants presented some evidence that Rawlinson received
confidential and proprietary information at the conferences, but they do not
allege that Rawlinson’s trips to Texas relate in any way to the breach-of-contract
claims against him.  Further, Rawlinson did not elect to visit Texas; it is
undisputed that he attended the conferences at Eurorsourcing’s direction.  Such
unilateral activity is insufficient to constitute relevant jurisdictional
contacts.  See Gonzalez v. AAG Las Vegas, L.L.C., 2009 WL 3490989,
at *5–6; Pelican State Physical Therapy, L.P. v. Bratton, No.
01-06-00199-CV, 2007 WL 2833303, at *9 (Tex. App.—Houston [1st Dist.] Sept. 27,
2007, no pet.) (mem. op.).  Moreover, visits to Texas that are unrelated to the
claims asserted are insufficient to establish specific jurisdiction.  See
Moki Mac, 221 S.W.3d at 588.

            The appellants also
presented evidence that Rawlinson accessed confidential and proprietary
information—via the company website and email—from company servers that happened
to be located in Texas.  To support their contention that these contacts are
relevant to the minimum-contacts analysis, the appellants cite to TravelJungle
v. American Airlines, Inc., 212 S.W.3d 841 (Tex. App.—Fort Worth 2006, no
pet.).  But TravelJungle is inapposite.  In that case, the court held
that jurisdiction existed because American’s causes of action, including trespass
of server, were directed to TravelJungle’s repeated accessing of American’s
website to obtain and sell American’s fare data.  Id. at 844, 849–51.  TravelJungle
was the operator of a travel website that accessed American’s website—sometimes
as often as 2,972 times per day—and took the information from the website to
use for its own commercial advantage, in direct violation of American’s terms
of use for its website.  Id. at 850.  The court held that TravelJungle
was subject to the jurisdiction of Texas courts because “it purposefully
directed its data-gathering activity toward AA.com’s servers, which are located
in Texas, for commercial, profit-driven purposes; thus, the basis for
jurisdiction specifically arises out of the conduct of which American
complains.”  Id. at 850.  

            In contrast, the appellants
here do not allege that Rawlinson acted improperly or unlawfully when accessing
the servers from the U.K., nor does Rawlinson’s access to them form the basis
for any of the appellant’s claims against him.  Further, the appellants
unilaterally chose the Texas location for the servers, and it is undisputed
that Rawlinson did not know where the servers were located.  Therefore,
Rawlinson could not have purposefully availed himself of the benefits of conducting
business in Texas by accessing the servers from the U.K.[5]  In
the absence of any allegation that Rawlinson purposefully directed any improper
activity towards their servers, Rawlinson’s business-related use of appellants’
website and email that happened to be routed through servers the appellants
chose to locate in Texas is merely fortuitous.  Even if we assume that
Rawlinson ultimately obtained confidential information from the Texas-based
servers and gave it to EquaTerra in breach of the various restrictive covenants
with the appellants, there is no allegation or evidence that he did so in
Texas.  See Gustafson, 118 S.W.3d at 484 (Michigan employee’s travel to
Texas twice for management meetings was not a contact connected to Texas
employer’s breach of confidentiality agreement claim when employer did not
assert that employee breached any duties to it or committed any torts during
those meetings).  Indeed, Rawlinson averred in his amended supporting affidavit
that all negotiations with EquaTerra Europe relating to his current employment
took place in the U.K., and the appellants do not challenge this testimony. 

            Appellants also argue
that Rawlinson’s employment-related contacts created “continuing relationships
and obligations” with Texas entities subjecting him to jurisdiction in Texas to
face the consequences of his activities.  See Burger King, 471 U.S. at
473.  For this proposition, appellants primarily rely on Burger King and
a case from this court, Lathrop v. Personalysis Corp., No.
14-06-00074-CV, 2006 WL 3072072 (Tex. App.—Houston [14th Dist.] Oct. 31, 2006,
no pet.) (mem. op.).  Both cases are distinguishable.

            Burger King
instructs that we must look not merely to a party’s contract with the
nonresident; we must also examine the factors surrounding the contract—prior
negotiations and contemplated future consequences, the terms of the contract,
and the parties’ actual course of dealing—to determine whether the nonresident
purposefully established minimum contacts within the forum.  471 U.S. at 479. 
In that case, Burger King sued Rudzewicz, a franchisee, for breach of the
franchise agreement’s payment provision and for trademark infringement.  Id.
at 468–69.  Burger King alleged that Rudzewicz failed to make required monthly
payments and continued to use the Burger King trademarks at his restaurant
after the franchise was terminated.  Id. Burger King sued in Florida,
the location of its headquarters, even though Rudzewicz’s franchise was in
Michigan.  Id. at 466.  Rudzewicz argued that he was not subject to
personal jurisdiction in Florida because his restaurant was located in Michigan
and he had never even visited Florida.  Id. at 469, 479.  The Court
concluded that “this franchise dispute grew directly out of “‘a contract which
had a substantial connection with that State.’”  Id. at 479
(quoting McGee v. Int’l Life Ins. Co., 355 U.S. 220, 223 (1957)).  In
reaching its conclusion, the Court noted that Rudzewicz had “[e]schew[ed] the
option of operating an independent local enterprise,” and instead deliberately
“‘reached out beyond’ Michigan and negotiated with a Florida corporation for
the purchase of a long-term franchise and the manifold benefits that would
derive from affiliation with a nationwide organization.”  Id. at
479–80.  The Court also explained that in light of Rudzewicz’s “voluntary
acceptance of the long-term and exacting regulation of his business” from
Burger King’s Miami headquarters, the quality and nature of his relationship to
the company in Florida could in no sense be viewed as random, fortuitous, and
attenuated.  Id. at 480.  Further, Rudzewicz’s default on the required
payments to the Florida home office and his illegal use of Burger King’s
trademarks “caused foreseeable injuries to the corporation in Florida” and
therefore “it was, at the very least, presumptively reasonable for Rudzewicz to
be called to account there for such injuries.”  Id.

            Similarly, in Lathrop
v. Personalysis Corp., Lathrop, a Washington resident, was hired by
Manatech, a Washington corporation with its principal place of business in
Washington.  2006 WL 3072072, at *1.  Manatech was a licensee of Personalysis,
a Texas corporation, and as such, Manatech was an authorized distributor of the
Personalysis personality test and related consulting services.  Id.  Lathrop
often worked directly with Personalysis, selling its tests, using its services
to score the tests, and eventually signing a license agreement governed by
Texas law.  2006 WL 3072072, at *1–2.  Lathrop later reverse-engineered the
test in direct violation of the license agreement and began selling it as his
own product.  Id. at *2.  Personalysis sued Lathrop in Texas, alleging
that Lathrop used information learned during his training sessions in Texas to
reverse engineer the scoring methodology of the Personalysis test.  Id. 
This court concluded that Lathrop’s continuing relationship with Personalysis
resembled the franchising relationship in Burger King because the
license agreement between Lathrop and Personalysis provided that it was governed
by Texas law; the agreement contemplated that Personalysis would train Lathrop
to use its system; Lathrop’s agreement with Manatech specifically called for
training sessions in Houston; Lathrop contractually agreed to follow
Personalysis’s procedures, policies, standards, and materials; and Manatech,
the local licensee, monitored Lathrop’s day-to-day activities much like the
local district office that reported to Burger King in Florida.  Id. at 6–8.

            We conclude that
the facts of the present case are substantially different from those in Burger
King and Lathrop.  Here, Rawlinson was a U.K. employee of Eurosourcing,
a European branch of Technology Partners, and he was not a franchisee or
licensee of Technology Partners.  The record evidence shows that, other than
two required trips to Texas for company conferences and infrequent
communications initiated from Texas, Rawlinson’s employment activities occurred
exclusively in the U.K.  Further, Rawlinson did not “reach out” to Texas by
seeking employment in Texas; he averred that he did not solicit employment or
business in Texas and there is no contrary evidence.  And, as noted above,
Rawlinson’s confidentiality agreement with Eurosourcing and Technology
Partners, which is one of the agreements the appellants allege Rawlinson
breached, provided that it was governed by English law and the parties were
subject to the exclusive jurisdiction of the English courts.  More importantly,
there is no evidence that Rawlinson’s employment with Eurosourcing in the U.K. contemplated
a relationship with Technology Partners in Texas akin to the continued direct oversight
and compliance that Burger King and Personalysis required of their franchisees
and licensees.  Examining the factors surrounding Rawlinson’s contracts with Eurosourcing
and Technology Partners, including prior negotiations and contemplated future
consequences, along with the terms of the contract and the parties’ actual course
of dealing, see Burger King, 471 U.S. at 479, we cannot conclude that
Rawlinson purposefully established minimum contacts with Texas through a
continuing relationship with Technology Partners in Texas.  

            Moreover, as our
supreme court explained in Moki Mac, there must be a substantial
connection between the alleged contacts and the operative facts of the
litigation.  Moki Mac, 221 S.W.3d at 585.  Here, the appellants allege
that Rawlinson breached contracts containing non-compete, non-solicitation, and
non-disclosure covenants by, among other things, accepting employment with the appellants’
competitor, contacting or soliciting business from the appellants’ clients,
taking confidential and proprietary information from the appellants, and
providing such information to EquaTerra or its affiliates.  On the facts before
us, the majority of the focus of any trial would be directed to Rawlinson’s alleged
wrongdoing in the U.K., not Texas.  It is undisputed that Rawlinson lived and
worked in the U.K., entered into his contracts with appellants in the U.K., worked
for Eurosourcing in the U.K, negotiated his employment with EquaTerra Europe in
the U.K., and now works for EquaTerra Europe in the U.K.  If Rawlinson
contacted the appellants’ clients or provided the appellants’ confidential
information to EquaTerra or its affiliates, there is no evidence to suggest
that he would have done so anywhere but in the U.K.  

            The appellants assert
that minimum contacts are established by Rawlinson’s contracts with and employment
by Texas companies, his two trips to Texas for company conferences, his access
to the appellants’ servers in Texas through his use of the appellants’ website
and his email account, and his occasional communications with the appellants’
representatives outside of the U.K.  But these contacts are not substantially
connected to the operative facts of a trial based on the appellants’
allegations.  Although Rawlinson may have received confidential and proprietary
information at the Texas conferences or obtained it by remotely accessing the appellants’
Texas servers, the appellants do not identify the confidential information
Rawlinson allegedly provided to EquaTerra (or its affiliates) and they do not
allege that Rawlinson gave confidential information to EquaTerra in Texas.  Even
assuming that Rawlinson’s employment-related contacts were sufficient to
demonstrate purposeful availment, they do not create a substantial connection
to the operative facts of the litigation.  See Moki Mac, 221 S.W.3d at
585–88.  Therefore, Rawlinson lacks sufficient minimum contacts to enable a
Texas court to assert personal jurisdiction over him. 

            Other courts have
reached the same conclusion in analogous cases.              For example, in Gonzalez
v. AAG Las Vegas, L.L.C., Gonzalez was employed in Ohio at an automotive
dealership when an officer of Ascent Automotive Group, L.P., a Delaware
partnership located in Houston, approached him about a management position with
an Ohio Lexus dealership.  2009 WL 3490989, at *1.  Gonzalez traveled to
Houston to interview for the position, and while there he was asked to invest
in two Ohio dealerships and allegedly was offered the right to earn an
ownership interest in the dealerships.  Id.  Gonzalez became the general
manager of one of the dealerships, and as such he reported to Texas, received
his pay from Texas, and regularly telephoned Houston to report on the status of
the dealership.  Id.  AAG Las Vegas then hired Gonzalez to be the
general manager of a Las Vegas Lexus dealership, and Gonzalez moved from Ohio
to Las Vegas for the job.  While there, he traveled to Houston to attend a
general manager’s meeting.  Id.  After about a year, AAG Las Vegas
terminated Gonzalez and sued him for breach of the duty of loyalty, usurpation
of corporate opportunities, and a declaratory judgment that he was not entitled
to an ownership interest in the Ohio and Las Vegas dealerships.  Id. at
*2, 5.  The trial court denied Gonzalez’s special appearance, but the court of
appeals held that the employment-related contacts the appellants asserted
lacked a sufficient connection to the litigation’s operative facts.  Id.
at *5.  Based on the appellants’ pleadings, the court determined that
the operative facts of their claims concerned Gonzalez’s acts while general manager
in Las Vegas, and that Gonzalez’s employment-related contacts with Texas were “minimal.” 
Id. at *5–7.  Accordingly, the court held that Gonzalez lacked
sufficient minimum contacts to support the assertion of specific jurisdiction
in Texas.  Id. at *8.

            Likewise, in Rushmore
Investment Advisors, Inc. v. Frey, the Pennsylvania employee of a Texas
company was sued in Texas for breach of an employment contract,
misappropriation of trade secrets, and unfair competition.  231 S.W.3d at 526–27. 
The employer, Rushmore, contended that specific jurisdiction was proper over
Frey, the former employee, because she had entered into a written employment
agreement in Texas and was employed by a Texas firm for twenty-two months.  Id.
at 529–30.  Rushmore also contended that Frey represented to clients and
federal agencies that she worked in Texas, made trips to Texas for work,
maintained contact with clients in Texas, and signed an employment agreement
providing that Texas law would govern any disputes between the parties.  Id.
at 527.  The court upheld the trial court’s dismissal for lack of personal
jurisdiction because “merely contracting with a Texas company does not necessarily
constitute purposeful availment for jurisdictional purposes” and because
“Frey’s alleged liability did not arise from and was not related to activity
conducted within Texas,” but rather her activities in Pennsylvania.  Id.
at 530.

            In Pelican
State Physical Therapy, L.P. v. Bratton, the court of appeals affirmed the
grant of a special appearance even though the Louisiana-based defendant entered
into employment contracts with his Texas employer that contained, among other
provisions, non-compete, non-solicitation, and non-disclosure covenants; the
employee had taken many trips to Texas to attend company meetings; and he had
extensive communications with the employer’s personnel in Texas.  See
2007 WL 2833303, at *4–6.  In that case, Bratton managed a physical-therapy
clinic in Louisiana for his Texas employer, Pelican State.  Id. at *3.  When
Bratton resigned his employment and opened a competing clinic in Louisiana,
Pelican State sued him in Texas for breach of his employment contract.  Id.
at *4.  Pelican State argued that Bratton was subject to personal jurisdiction
in Texas because Bratton’s regular business contacts and communications with
its parent company’s Houston office created continuing obligations with a Texas
resident.  Id. at *7.  Through these obligations, Pelican State argued, Bratton
derived substantial personal benefits and thus availed himself of the privilege
of conducting business in Texas.  Id.   The court rejected this
argument, explaining that the status of employment and the signing and possible
breach of an employment agreement were not “continuing obligations” sufficient
to establish the substantial connection required to support the exercise of
personal jurisdiction.  Id. at *7–9.  Further, the court
concluded that Pelican State’s allegations and the evidence showed that Pelican
State’s lawsuit involved acts in Louisiana, and thus Pelican State’s asserted Texas
contacts were not substantially related to the litigation’s operative facts.  See
id. at *8–9.

In another analogous case, Gustafson v. Provider
HealthNet Services, Inc., the court of appeals rejected a Texas employer’s
assertion that specific jurisdiction existed over its former Michigan employee
because the employment relationship created “continuing obligations” with
Texas.  See 118 S.W.3d at 484.  PHNS, a Delaware company with its
principal place of business in Texas, hired Gustafson, a Michigan resident, to
provide outsourcing services to a Michigan hospital.  Id. at 481.  PHNS
later terminated Gustafson’s employment and sued him in Texas for breach of his
confidentiality agreement, misappropriation of trade secrets and business
information, and breach of fiduciary duties.  Id. PHNS pointed to the following
contacts to show specific jurisdiction over Gustafson:  (1) the employment
relationship itself; (2) two short visits to Texas associated with Gustafson's
employment; (3) Gustafson was paid from a Texas bank; (4) Gustafson submitted
requests for reimbursement to PHNS’s Texas office and cashed checks for
reimbursement that were drawn off a Texas bank; (5) Gustafson communicated with
PHNS’s employees that were located in Texas; (6) Gustafson’s health benefits
were administered from PHNS’s Texas offices; (7) Gustafson’s health insurance
was through Blue Cross Blue Shield of Texas; and (8) insurance agents located
in Texas administered Gustafson’s dental and life insurance.  Id. at
483.  

The Gustafson court determined that, based on
the claims alleged, these contacts were not sufficient to establish specific
jurisdiction because the contacts were not “connected to Gustafson’s execution
of the confidentiality agreement, or his dissemination of confidential
information, both of which occurred in Michigan.”  Id. at 484.  The
court went on to reject PHNS’s assertion that “continuing obligations” arising
from the employment relationship established jurisdiction. Id. The court
expressly distinguished Burger King, noting that in Burger King
the contract between the franchisor and franchisee required performance in the
forum state and the agreement expressly provided that it was governed by the forum
state’s law.  Id.  In contrast, Gustafson had not signed an employment
agreement, but he did sign a confidentiality agreement that was executed in
Michigan, made no reference to Texas, and did not require any performance in
Texas.  Id.  Lastly, the court recognized that a breach of the confidentiality
agreement “could cause an injury in Texas,” but concluded that “the mere fact
that an injury is caused in the forum state is insufficient to establish
minimum contacts.”  Id.

            In an effort to
identify contacts substantially connected to the litigation’s operative facts, the
appellants contend that Rawlinson failed to negate all bases of jurisdiction
alleged against him because he has provided no evidence to show that the
various agreements and restrictive covenants did not require performance in
Texas.  By this argument, the appellants appear to suggest that Texas has
personal jurisdiction over Rawlinson because he was contractually prohibited
from competing against Technology Partners in Texas—and apparently anywhere
else in the world.  Consequently, the appellants argue, the covenants require
performance in Texas and so personal jurisdiction is proper here.  The appellants
also stress that Rawlinson has admitted that he breached the non-compete
agreements, but we do not consider the merits of appellants’ claims when
conducting a personal-jurisdiction analysis.  See Weldon-Francke v. Fisher,
237 S.W.3d 789, 792 (Tex. App.—Houston [14th Dist.] 2007, no pet.).  

            We disagree that
a nonresident may be automatically subject to personal jurisdiction in any forum
in which he is prohibited from engaging in business based on a non-compete
agreement, without regard to whether he actually engaged in competitive
activities in the forum or otherwise lacked minimum contacts.  Further, we conclude
that an agreement not to compete in a forum is more properly viewed as an
agreement to refrain from performance in the forum rather than a contact with
the forum.  As one court explained:

“If the question is whether an individual’s contract with
an out of state party alone can automatically establish sufficient minimum
contacts in the other party’s home forum, we believe the answer is clearly that
it cannot.”  This holding must apply with particular force where the
contract is one to refrain from doing an act in Texas.

Dowdy v. Miller, 122
S.W.3d 816, 822 (Tex. App.—Amarillo 2003, no pet.) (quoting Burger King,
471 U.S. at 478)) (emphasis added); see also Brocail, 132 S.W.3d at 564
(“‘[I]t is difficult to see how a failure to act could meet the purposeful
availment requirement needed to establish personal jurisdiction.’”) (citing Anderson
v. Bechtle, No. 01-00593-CV, 2001 WL 930205, at *2 ((Tex. App.—Houston [1st
Dist.] Aug. 16, 2001, no pet.) (not designated for publication)).  Therefore, we
decline to adopt a position that an employee, by agreeing to a non-compete or
non-solicitation agreement, is effectively consenting to jurisdiction as
far-reaching as the scope of the agreement, which in this case is worldwide.  It
cannot be enough that Rawlinson simply agreed not to compete or solicit clients
in Texas.  To hold otherwise would supplant the minimum-contacts analysis and
thus vitiate the due-process requirements for personal jurisdiction

            Based on
the foregoing, we hold that the trial court did not err in granting Rawlinson’s
special appearance and dismissing him from the case because Rawlinson lacks the
minimum contacts required for the trial court to exercise personal jurisdiction
over him.  Therfore, we do not consider whether the exercise of personal
jurisdiction over him comports with traditional notions of fair play and
substantial justice.

*
* *

            We affirm
the trial court’s judgment.

 

                                                                                    

                                                                        /s/        Jeffrey
V. Brown

                                                                                    Justice

 

 

 

Panel
consists of Justices Yates, Frost, and Brown.

 









[1]
MCP-TPI is not a party to the lawsuit below.





[2]
Although it is a defendant below, EquaTerra, Inc. is not a party to this
appeal.  EquaTerra Europe is not a party to this lawsuit.





[3]
Here, the trial court held a hearing on Rawlinson’s special appearance, but we
have no reporter’s record of the hearing.  Because neither party contends the
hearing was evidentiary and the record does not indicate otherwise, we will
presume that the hearing was non-evidentiary and that the trial court
considered only the evidence filed with the clerk.  See Michiana Easy
Livin’ Country, Inc. v. Holten, 168 S.W.3d 777, 784 (Tex. 2005).





[4] As an initial matter, Rawlinson contends that the
appellants failed to plead adequate jurisdictional facts to shift the burden to
him to negate every pleaded basis for jurisdiction over him.  We disagree.  As
discussed above, the appellants alleged that Rawlinson entered into contracts
with Texas companies calling for performance in part in Texas, and that he
breached his agreements with the appellants.  The appellants also alleged that
Rawlinson “has engaged in significant activities in or related to Texas, [and]
has conducted business and negotiated in Texas with Texas residents.”  Liberally
construing the pleadings, we conclude that the appellants’ jurisdictional
allegations were sufficient to shift the burden to Rawlinson to negate the
jurisdictional allegations.  See Tex. Civ. Prac. & Rem. Code Ann. §
17.042 (acts that may constitute “doing business” include “contract[ing] by
mail or otherwise with a Texas resident and either party is to perform the
contract in whole or in part in this state”); Huynh v. Nguyen, 180
S.W.3d 608, 619–20 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (stating
plaintiff’s minimal pleading requirement is satisfied by an allegation that the
nonresident defendants are doing business in Texas).





[5]
TravelJungle also contended that it could not be subject to personal
jurisdiction because it did not know where American’s servers were located, but
the court rejected TravelJungle’s contention, concluding that TravelJungle
purposefully directed its activities to American’s website and so “should have
been aware” that it would be subject to jurisdiction in any forum where the
website’s servers were located.  See TravelJungle, 212 S.W.3d at 851. 
In reaching this conclusion, the court drew an analogy to federal cases in
which senders of spam emails were held to be subject to personal jurisdiction
in the forum in which their emails were received or where the servers
processing those emails were located because the senders purposefully targeted
email addresses using a particular server and so assumed the risk that they
would be haled into a forum where that server is located.  See id.
at 850–51.  In contrast, this case involves no allegations or evidence that Rawlinson
purposefully directed any improper activities toward Technology Partners’s
website or servers, and the facts are not analogous to those involving mass
spam emails.  Therefore, we do not similarly discount Rawlinson’s assertion
that he did not know the location of Technology Partners’s servers.